T. HASKINS DUPUY, Appellant, *v.* CHARLES PEMBERTON WURTZ, Executor, etc., et al., Respondents.

The validity of the execution of a will of personal property depends upon the law of the place where the testator was domiciled at the time of his death, not at the time of the execution of the will.

For the purpose of succession every person must have a domicil, and but one; and the domicil of origin will be presumed to continue until a new one is acquired. To effect a change for such purpose there must not only be a change of residence but an intention to abandon the former domicil, and acquire another as a *sole* domicil.

Long-continued change of residence is strong evidence of intent to change the domicil; but alone and unaccompanied by the intent, will not effect a change. The intention to make such a change, especially where the change is to a foreign country, must be established by very clear proof; a mere declaration of an intention not to return is not conclusive as to a change of domicil. The question is, in all cases, a question of fact to be determined by the particular circumstances of each case.

The testatrix, a resident of and domiciled in New York, went abroad with her husband in 1859, on account of her health. She spent her winters at Nice, occupying rooms at a hotel; one room for storing her property she hired by the year; the summers she spent in traveling. She made her will at Nice in 1868, executed in accordance with the laws of this State, but not according to the requirements of the French law. Up to that time she kept her house in New York city unoccupied, intending and expecting to return as soon as her health would admit. About that time she began to abandon the hope of restored health and of a return, still claiming, however, in her letters and in her will, her residence in New York. Afterward she rented her house in New York, retaining one room to store some of her effects, and declared in letters and orally that she did not expect to return to her home in New York. In other respects she continued to live as before. She retained her investments in this State and made none abroad.

*Held*, that the evidence failed to establish an intention to adopt a foreign domicil; and it not appearing that the testatrix had acquired a new

domicil as respects her succession, she did not lose by her relinquishment of her plan of return, her domicil in New York, and that the will was valid.

The authorities upon the question of domicil, collated and discussed.

*It seems* that, under the provisions of article 13 of the Code Napoleon, which provides that a foreigner who shall have been permitted by authorization of the Emperor to establish his domicil in France shall then enjoy all civil rights so long as he continues to reside in France, foreigners are not admitted to the exercise of all civil rights, and, consequently, cannot acquire a domicil in France, without having obtained the prescribed authorization and continuing to reside there. Also, that by the law of domicil, as applied to succession, is meant, not the general law, but the law which the country of the domicil applies to the particular case under consideration.

As, therefore, no such authorization was obtained by the testatrix, and as, according to the French laws, as well as the law of this State, the will under consideration is valid, it having been executed in conformity with the domicil of origin, the inquiry into domicil is unnecessary.

(Argued April 4, 1873; decided November 11, 1873.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, affirming a decree of the surrogate of the county of New York admitting to probate the will of Martha P. Wurtz, deceased.

The testatrix was the widow of John Wurtz, deceased, and died without children. Her will was made and executed at Nice, November 21, 1868. It covered real and personal property, and was executed and published in accordance with the laws of this State. The probate was contested upon the ground that the will was not executed according to the laws of France, where the contestants alleged that the testatrix was domiciled at the time of her death. The testatrix and her deceased husband, John Wurtz, were native-born citizens of the United States. They resided together in his house, corner of Eleventh street and Fifth avenue, in the city of New York, for many years prior to the year 1859, when they both went to Europe for the benefit of their health. On their departure they left their house and furniture, and other property in it, unoccupied, until they

should return to occupy it. Mr. Wurtz died in Rome, in 1861, leaving a will, which was admitted to probate in New York, as a will of real and personal property, whereby he devised all his residuary estate to Mrs. Wurtz absolutely. At the time of Mr. Wurtz' death the decedent was an invalid, and so continued until her death in January, 1871. The facts bearing upon the question of domicil are sufficiently stated in the opinion.

·The surrogate held that she had not lost her domicil in New York, and admitted the will to probate.

*Frederic R. Coudert* for the appellant. It was proper to assume Nice to be the residence of the testatrix at the time of her death. (Story's Con. of Laws, 44, Rule 6; Hagg. Consist., 374, 437; 2 Kent's Com., 532; *Bruce* v. *Bruce,* 6 Bro. P. C., 566; 2 B. & P., 230, note; *Ennis* v. *Smith,* 14 How. U. S., 423; *Hegeman* v. *Fox,* 31 Barb., 475.) The law of the domicil at the time of the death of the testatrix must govern the execution of the will as far as the personal property is concerned. (2 Edm. R. S., 69; *Isham* v. *Gibbons,* 1 Bradf., 70; *In re Cath. Roberts' Will,* 8 Paige, 520; *Moultrie* v. *Hunt,* 23 N. Y., 408.) A fixed and permanent residence or domicil in a State is essential to the character of citizenship. (*Prentiss* v. *Brennan,* 2 Blatch., 162; *The Pizarro,* 2 Wheat., 227; *Butler* v. *Farnsworth,* 4 Wash. C. C., 101.) Recitals of domicil in a deed or will and declarations thereof are not conclusive, but may be rebutted by proof that the actual domicile was elsewhere. (*Gilman* v. *Gilman,* 52 Me., 165; *In re Somerville,* 4 Ves., 750; *Attorney-General* v. *Kent,* 1 H. & C., 12; *Butting* v. *Thornton,* Addams, 19; Whart. on Int. Law, § 61; *Hegeman* v. *Fox,* 31 Barb., 475; *Silliman* v. *Moseby,* 14 La. An., 710; *In re Steer,* 3 H. & N., 594; *Topp* v. *Wood,* 34 L. J. Chan., 211; *Isham* v. *Gibbons,* 1 Bradf., 69; *De Bonneval* v. *De Bonneval,* 1 Curt., 856; *Moore* v. *Budal,* 4 Hagg., 346.)

*S. P. Nash* for the respondents. The domicil of origin is not lost until a new one is acquired. (*Graham* v. *Public*

*Admr.*, 4 Bradf., 127, 128.) Deceased did not lose her domicil of origin by her long residence in Europe. (*Isham* v. *Gibbons*, 1 Bradf., 69; *White* v. *Brown*, 1 Wal., Jr., 217; *Attorney-General* v. *Countess de Wahlstadt*, 3 H. & C., 374; *Udny* v. *Udny*, L. R., 1 H. L.; Scotch App., 441.) There was no evidence to establish that deceased had any right as a domiciled citizen in France. (Code Civil, bk. 1, tit. 1, chap. 1, §§ 7–16.)

Rapallo, J.   When Mrs. Wurtz went to Europe with her husband, in 1859, she was domiciled in the city and State of New York. She and her husband were natives of the United States. It does not appear in the case that she ever had had any domicil except in this State, and it seems to be conceded on both sides that this was her domicile of origin.

It is not pretended that she or her husband had abandoned their domicil in New York up to the time of his death in Europe in 1861; and from the evidence, which we have carefully examined, but do not consider it necessary to recite in detail, we are clearly of opinion that, up to the fall of 1868, she had not for a moment relinquished her intention and expectation, often declared orally, and in her written correspondence, of returning to her home in New York as soon as the condition of her health should permit; that her sojourn in Europe was compulsory, being caused by ill health and the advice of her physician that she was not physically able to bear the voyage and the excitement which would await her on her return; that she had not acquired any domicil abroad, and up to the time of the execution of the will in question, November 21, 1868, she continued to be a citizen of this State.

But it is claimed on the part of the contestants that although it should be conceded that she was a citizen of New York at that time, and then intended to return, she changed her intention, after executing the will, and acquired a domicil at Nice, and that this change destroyed the validity of the will, it not having been executed according to the laws of

France. This is the only branch of the case which presents questions of difficulty.

The counsel for the contestants is sustained by authority in the position that the domicil of the testatrix at the time of her death, and not at the time of the execution of the will, is the material inquiry; and that as to personal property, the question of intestacy, or of the valid execution of her will, depends upon the law of the place where she was domiciled at the time of her death. This question was decided after much discussion, and notwithstanding the dissents of three eminent judges of this court, in the case of *Moultrie* v. *Hunt* (23 N. Y., 394).

In England, the embarrassments likely to arise from such a rule are now obviated, as to British subjects, by the act of Parliament of 24 and 25 Victoria, chapter 114, 1861–2, which ·provides in substance, as to wills made after the passage of the act, that wills of personal estate made out of the United Kingdom by a British subject shall be deemed well executed, whatever may be the domicil of the testator at the time of making the will, or of his death, if made according to the forms required by the law of the place where made, or of the place of the domicil of the testator at the time of making the.will, or of the laws then in force in that part of her majesty's dominions where he had his domicil of origin. Also, that no subsequent change of domicil shall affect the validity or construction of the will. This enactment substantially conforms the law of England to that which generally prevails in continental Europe. We have no such statute, and must therefore follow the rule laid down in *Moultrie* v. *Hunt*, and hold that if at the time of her death, January 8, 1871, Mrs. Wurtz had changed her domicil and ceased to be a citizen of this State, her will is not valid here, unless it would be valid according to the law of the place of her domicile at the time of her death. (See also 1 Brad., 69; Story Conf. L., § 473.) The important question, therefore, is whether the evidence establishes such a change of the domicil of the testatrix as is alleged by the contestants.

A reference to some of the elementary principles governing questions of domicil will facilitate this inquiry.

One leading rule is that for the purposes of succession every person must have a domicil somewhere, and can have but one domicil, and that the domicil of origin is presumed to continue until a new one is acquired. (*Somerville* v. *Somerville*, 5 Ves., 750, 786, 787; Story Conf. Laws, § 45; *Abington* v. *N. Bridgewater*, 23 Pick., 170; *Graham* v. *Pub. Admr.*, 4 Brad., 128; *De Bonneval* v. *De Bonneval*, 1 Curtiss, 856; *Attorney-General* v. *Countess of Wahlstatt*, 3 Hurl. & Colt., 374; *Aikman* v. *Aikman*, 3 McQueen, 855, 863, 877.)

The statute of New York of 1830 (2 Stat. at Large, p. 69, § 69 *a*), referred to by the learned counsel for the contestants, does not affect this principle, nor does it aïd in determining whether Mrs. Wurtz had lost her domicil or citizenship in New York.

The object and effect of this act are fully explained in *Matter of Catharine Roberts' Will* (8 Paige, 525, 526); *Isham* v. *Gibbons* (1 Bradf., 69; 4 Bradf., 128.)

To effect a change of domicil for the purpose of succession there must be not only a change of residence, but an intention to abandon the former domicil, and acquire another as the sole domicil. There must be both residence in the alleged adopted domicil and intention to adopt such place of residence as the sole domicil. Residence alone has no effect *per se*, though it may be most important, as a ground from which to infer intention. Length of residence will not alone effect the change. Intention alone will not do it, but the two taken together do constitute a change of domicil. (*Hodgson* v. *De Beauchesne*, 12 Moore P. C. Cases, 283, 328; *Munro* v. *Munro*, 7 Cl. & F., 877; *Collier* v. *Rivaz*, 2 Curteis, 857; *Aikman* v. *Aikman*, 3 McQueen, 855, 877.) This rule is laid down with great clearness in the case of *Moorhouse* v. *Lord* (10 H. L., 283, 292) as follows: Change of residence alone, however long continued, does not effect a change of domicil as regulating the testamentary acts of the individual. It may be, and is, strong evidence of an intention to change the domicil. But unless in.

addition to residence there is an intention to change the domicil, no change of domicil is made. And in *Whicker* v. *Hume* (7 H. L., 139) it is said the length of time is an ingredient in domicil. It is of little value if not united to intention, and is nothing if contradicted by intention. And in *Aikman* v. *Aikman* (3 McQueen, 877) Lord CRANWORTH says, with great conciseness, that the rule of law is perfectly settled that every man's domicil of origin is presumed to continue until he has acquired another sole domicil with the intention of abandoning his domicil of origin; that this change must be *animo et facto*, and the burden of proof unquestionably lies upon the party who asserts the change.

The question what shall be considered the domicil, of a party, is in all cases rather a question of fact than of law. (*Bruce* v. *Bruce*, 6 Bro. Par. C., 566.) With respect to the evidence necessary to establish the intention, it is impossible to lay down any positive rule. Courts of justice must necessarily draw their conclusions from all the circumstances of each case, and each case must vary in its circumstances; and moreover, in one a fact may be of the greatest importance, but in another the same fact may be so qualified as to be of little weight. (12 Moore Priv. C. C., 330.)

In passing upon such a question, in view of the important results flowing from a change of domicil, the intention to make such a change should be established by very clear proof (*Donaldson* v. *McClure*, 20 Scotch Session Cases, 2d series, 321; S. C. affi'd, 3 McQueen, 852), especially when the change is to a foreign country. (*Moorhouse* v. *Lord*, 10 H. L., 283.)

The intention may be gathered both from acts and declarations. Acts are regarded as more important than declarations, and written declarations are usually more reliable than oral ones.

The principal if not the only act done by Mrs. Wurtz, in 1868, bearing upon the question of an intention to abandon her domicil in New York, consisted in her letting her house in Fifth avenue to Mr. Gray in that year. This house she

had kept unoccupied during all her stay abroad up to that time, and it is to be observed that in letting it to Mr. Gray, the testatrix reserved one room for the storage of some of her effects. In all other respects she continued to live, after 1868, as she had done during the preceding nine years, dwelling all the time in hotels, passing her winters at Nice, and during the residue of the year traveling on the continent and in England. Nice had for many years been her head-quarters. She there retained one room in the hotel for the storage of such personal effects as she did not desire to take with her upon her travels. The same reasons which had theretofore prevented her from returning to what she invariably called her home, still continued to exist. She had failed to recover the health of which she was in pursuit, and her physicians still continued to advise her that her health would not permit her to make the voyage home. But up to the time of her death she retained her property and investments in this State, made no investments abroad, did not purchase or even hire a permanent place of residence, and lived continually in hotels.

But after the execution of the will there was a change in the tenor of her correspondence, and in some of her oral declarations on the subject of returning to what she still continued to call her home, and it is upon these declarations that the contestants' case principally rests. In all her correspondence, up to the time of the making of the will, whenever the subject was alluded to, she had clearly exhibited not only an intention, but a determination and expectation of returning as soon as her health should permit, and in many instances she had mentioned a definite period for the continuance of her sojourn abroad, and in others down to October, in 1868, she placed the continuance of her stay upon the ground that her physicians would not permit her to return.

On the 20th of April, 1868, she wrote to Mr. Seymour: " Dr. Pantaleone has told me very plainly that he cannot permit me to cross the Atlantic; that I have no strength to combat a voyage, and all the trials that are to meet me on my arrival. So here I am." On the twenty-ninth of Sep-

tember she again writes: "In fact with that and other troubles I have been ill, and have been put back three years in my convalescence. Now I never expect to be well." And on the 3d of October, 1868, she says to Mrs. Seymour: "But my nervous system has been shattered, and after the experience of the past year (in heavy trials) I see why my physicians have not wished me to go home. * * * Do you not think my articles ought to be in one place, except the silver?"

The first letter of all the series in evidence, bearing upon the question of an abandonment of the intention to return, was written on the 21st of November, 1868, the very day of the execution of the will. It is addressed to Mrs. Seymour. In it the testatrix says: "I am now in Dr. Pantaleone's care, and find all three physicians, Dr. Vallery in Rome, Dr. Mannoir in Geneva, and Dr. Pantaleone, agree that it is rest and tranquillity of mind is very important to me. Many thanks for your kind wishes. But except to see a few friends I have no inducement to return to America. My nerves would not endure the shock, and it is plain that my life is more quiet here. But I do not intend to expatriate myself, and hold firmly to my allegiance to my beloved country." In her will, bearing date the same day, she makes the following declaration: "As I have for several years resided in Europe, sojourning now at one place, and now at another, as my health and comfort have required, I deem it proper for me here to say, that I consider my home and residence as still being in the city of New York, in my beloved country, the United States of America." August 5th, 1869, from Geneva she writes to Mrs. Seymour as follows: "I think Charles is staying in Europe on my account, and I never expect to return. But I feel badly at any sacrifice for me. But Dr. Pantaleone is correct. Any moral excitement upsets me away from turbulent spirits, and there is much to worry me at home." And on the 13th of October, 1870, the last date of the series of letters in evidence, she writes to Mrs. Courtney: "I never can live in a cold climate again, and the

few years I have to live, I want to live in comfort and repose."

These are all the written declarations of the testatrix bearing upon the question. There was also evidence of oral declarations, but they do not throw any additional light upon the intentions of the testatrix. Mary Brown, a colored servant, who was in the service of the deceased during all her stay in Europe, testified that she always said, of late years, ·that she never. would return to America. That the doctors told her she was not able to come, and, finally, she gave it up, and said she would not come. Mrs. Slemmer testified that, at Geneva, in the summer of 1870, Mrs. Wurtz said to her, "I know when I am well off, indeed I am not going back; I should never have any comfort if I did." She said she had no intention of returning, and had let her house and disposed of her furniture. Mr. Sandford testified that he had frequently spoken to her of her returning to America, and her reply invariably was that she could not come, that her health would not admit of it. Mr. Gray and Mr. Aldis testified substantially to the same effect.

This is, in substance, all the evidence in the case tending to show a change of domicile. The present is one of the exceptional cases in which the duty devolves upon this court to pass upon the facts as well as the law. And we think that the conclusion of fact, fairly to be drawn from all the evidence, is that the testatrix, after having long and consistently entertained the intention of returning, had finally become satisfied that the state of her health and nerves was such that she would be unable to return to her home, and would, in all probability, die abroad. At the same time it establishes no intention to adopt a foreign domicil, but that she desired and claimed to retain her domicil of origin, and to have her estate administered according to the laws of the State of New York. This, the learned counsel for the contestants contends, the law would not permit her to do. That her long continued stay in Europe, in connection with her final abandonment of the idea of returning to New York;

her dwelling, during the winter of each year, at Nice, furnishing, in part, the rooms which she occupied in the hotel; the removal to that place of a portion of her personal effects, her hiring an apartment in the hotel by the year for the storage of such articles as she did not carry with her on her summer travels, and always returning to the same place, afforded such clear evidence of the abandonment of her domicile in New York, and adoption of a new domicil at Nice, that no claim on her part to continue to be considered a citizen and resident of New York could preserve her domicil of origin; and he has cited numerous authorities in support of these positions.

An examination of these authorities will show that they proceed upon the ground that the person whose domicil was in question had actually settled in a new residence, with the intention of making it a permanent home; that this intention was manifested by unequivocal acts which outweighed any declarations to the contrary, and the intention was found as matter of fact.

The principal cases referred to in this connection are *Stanley* v. *Bernes* (3 Hagg. Ecc. R., 373), *In re Steer* (3 H. & N., 594), *Anderson* v. *Laneuville* (9 Moore Priv. C. Cases, 325), *Hoskins* v. *Matthews* (35 Eng. L. & Eq., 540), *Whicker* v. *Hume* (13 Beav., 384; 7 H. L., 124), *Hegeman* v. *Fox* (31 Barb., 475), *Ennis* v. *Smith* (14 How. U. S., 423).

In *Stanley* v. *Bernes*, the testator, a British subject, had been naturalized in Portugal, and the point decided was that a British subject might acquire a domicil abroad (a proposition which had been disputed, *Curling* v *Thornton*, 2 Addams' R., 19), and that his claim to be considered a British subject did not destroy his foreign domicil. In *re Steer*, the testator had resided many years in Hamburg, and had been regularly constituted a burgher of that city to enable him to trade there. In his will, made while on a visit to England, he recited those facts, and his intention to return to Hamburg, and at the same time declared that he did not mean to renounce his domicil of origin as an Englishman. The court

in that case conceded the principle of law that the domicil of origin continued until the testator had manifested an intention of abandoning it and acquiring another as his sole domicil, but held that there was evidence of such an intention, and decided, as matter of fact, that he had elected Hamburg as his domicil; that he thereby necessarily gave up his English domicil, as he could not retain both, and that the declaration in his will was unavailing. In *Anderson* v. *Laneuville*, the testator's domicil of origin was in Ireland. He had incontestably changed his domicil to England. He afterwards broke up his establishment in England and moved to France, where he bought and furnished a house, in which he resided permanently for thirteen years. The contest was between his English and French domicile, and was decided as a question of fact. In *Hoskins* v. *Matthews*, the decedent was held to have acquired a domicile in Tuscany by residence, the purchase of a villa and the establishment of his family there. Notwithstanding his continued attachment for his native country, and his often expressed desire to return there, and the fact that he was obliged, by his health, to live in a milder climate than that of his birth, the fact being established that he had formed the intention of permanently changing his domicil, the court held that the change was not the less effectual because induced by motives of health; at the same time admitting that even a permanent residence in a foreign country, occasioned by the state of health, may not operate as a change of the domicil, and that every case must stand upon its own circumstances.

In *Whicker* v. *Hume* (13 Beav., 384, and 7 H. L., 124), the domicil of origin of the testator was in Scotland. The evidence of an abandonment of that domicil, and the adoption of a domicil in England was clear. Afterward he went to France, leaving some of his property in England, which he desired a friend to keep for him until his return. He died in Paris, having just made a will in the English form, which was sustained.

The Scotch domicil was regarded as entirely out of the

question, and the contest was between the English and French domicile. (7 H. L., 139.)

In *Hegeman* v. *Fox*, much relied upon by the contestants, the question was whether the testator was at the time of his death domiciled in Florida. He was a native of Massachusetts, had been domiciled in New York, afterward in Williamsburgh, and then removed to Florida. There was no evidence of any intention to retain his domicil in Williamsburgh, and the opinion of the court was that the weight of the evidence established that he neither expected or intended to return to the northern States. He purchased a plantation in Florida, stocked it, and furnished his house, went to housekeeping, entered into the business of planting, and made other family arrangements looking to a permanent residence there. Upon these facts it was held that the circumstances that this change of residence was induced by considerations of climate and health, and that domestic troubles intervening induced the expression of an intention to return to New York, did not overcome the effect of his acts, which clearly indicated an intention to make his permanent home in Florida. The case is well reasoned in the opinion of the court, and does not conflict in principle with the result at which we have arrived, but depends upon its own peculiar circumstances.

In *Ennis* v. *Smith* the question was whether General Kosciusko had acquired a domicil in France. He left Poland voluntarily, came to this country, and afterward went voluntarily to France, where he lived for fifteen years. He could have returned to Poland at any time. He was made a French citizen by decree of the national assembly, of which privilege he could not avail himself unless he became domiciled in France. Residence was, in that case, said to be *prima facie* evidence of domicil, and the facts were held to establish a domicil in France.

In all these cases it was upon the ground of a clearly proved voluntary and intentional acquisition of a foreign domicil that the courts held the former domicil abandoned.

The late cases of *Jopp* v. *Wood* ([1864], 34 L. J., Eq., 212)

and *Moorhouse* v. *Lord* (10 H. L., 284) proceed upon the ground that in order to acquire a new domicil there must be an intention to abandon the existing domicil. All the authorities agree that to effect a change of domicil there must be an intention to do both. Some of them hold that the intention to do one implies an intention to do the other. But in all the cases the question of intention is treated as one of fact, to be determined according to the particular circumstances of each case. (See also *Douglas* v. *Douglas*, Law Rep., 12; Eq., 617, 647; *The Attorney-General* v. *The Countess de Wahlstatt*, 3 Hurl. & Colt., 374; *Udny* v. *Udny*, L. R., 1 Scotch App., 441, 1070; *White* v. *Brown*, 1 Wallace, Jr., 217.)

In the present case we find no sufficient evidence of an intention to adopt Nice or any other place as a permanent home or domicil. The plans of the testatrix after November, 1868, so far as disclosed, had reference to failing health and an apprehension that she might not long survive, rather than to adopting and settling in a new home. If she chose to be a wanderer during the short period of life which she supposed might still remain to her, she would not thereby, as respects her succession, lose her domicil of origin. (*Attorney-General* v. *Countess of Wahlstatt*, 3 H. & C., 374; *White* v. *Brown*, 1 Wall., Jr., 217.)

Her long residence abroad, upon which the contestants rely, is not very significant in this case, as during by far the greater part of that time, in fact during all except about two and a quarter years before her death, she was clearly shown to be a mere sojourner in Europe, intending and fully expecting to return, and retaining her house in New York; and all the acts relied upon to show the acquisition of a domicile in Nice were done during that period, and while there can be no doubt of her continuing to be a citizen of New York. Her habit of spending her winters in Nice, her furnishing her rooms, hiring a store-room at the hotel, the bringing out there of her nick-nacks as they are called, were all before she had given any evidence of the relinquishment of her plan of return, and while she still retained her house in Fifth

Avenue, New York. The only evidence of any change consists in her declarations. These indicate no intention to settle permanently in any particular place, and are clearly contradictory of any intention to abandon her domicil in New York. A mere declaration of intention not to return is not conclusive as to a change of domicil. As well expressed by Lord KINGSDOWN in *Moorhouse* v. *Lord* (10 H. L., 293): "I can well imagine a case in which a man leaves England with no intention whatever of returning, but with a determination and certainty that he will not return." He then supposes the case of one laboring under a mortal disease, whose physician advises him that his life may be prolonged or his sufferings mitigated by a change to a warmer climate, and says that to hold that he cannot do that without losing his right to the intervention of the English laws as to the transmission of his property after his death, would be revolting to common sense and the common feelings of humanity. (See S. C., p. 283, per Lord CRANWORTH; Story Conf. Laws, §§ 45, 46; Guthrie's Savigny, 62, 63; *Munro* v. *Munro,* 7 Cl. & Fin., 842, 876; 1 Robt. Ecc. R., 606; 2 Hurl. & Colt., 982; 3 id., 374.

Unless a new domicil was acquired, as has been already shown, the domicil of origin continues, and must govern, else there would be no law according to which the estate could be administered, especially in a case of intestacy. It must be shown that the deceased has subjected her estate to the law of some other country, in order to exempt it from the operation of the laws of her own State, and in this connection the reference which has been made to article 13 of the Code Napoleon becomes important. That act provides that a foreigner, who shall have been permitted by authorization of the emperor to establish his domicil in France, shall there enjoy all civil rights so long as he shall continue to reside there.

This article has been referred to on the part of the proponents, and the fact that Mrs. Wurtz never availed herself of its provisions adverted to, for the purpose of showing an absence of intention to become domiciled in France. It is,

undoubtedly, a circumstance to be considered in connection with the other circumstances of the case. In *Whicker* v. *Hume* (13 Beav., 384, 401) and *Anderson* v. *Lanewville* (9 Moore Priv. C. C., 225), a compliance with the provisions of article 13 was held not to be essential to the acquisition of a domicil in France for purposes of succession. In *Collier* v. *Rivaz* (2 Curteis Ecc. R., 855), and in *Bremer* v. *Freeman* (1 Deane, 192), it was held in the Prerogative Court to be necessary, and the will of an Englishwoman domiciled in France, but without having obtained the authority prescribed by article 13, was held valid, though executed in the English form.

On appeal in this case the subject was fully considered, and the decision of the Prerogative Court reversed. (10 Moore Priv. C. C., 306.) But this reversal was placed wholly upon the ground that, according to the law of France, the succession of a foreigner, who had acquired a domicile there according to the *jus gentium*, would be regulated by the French law, even though he had not obtained the authorization prescribed by article 13. In that case, French barristers were examined on both sides as to the law of France upon this subject, and the construction of article 13. Their testimony was conflicting. The court, on appeal, held that foreign law was a matter of fact, to be ascertained by the evidence of experts skilled in such law; but that, when their evidence was unsatisfactory and conflicting, the appellate court would examine for itself the decisions of the foreign courts and the text-writers, in order to arrive at a satisfactory conclusion upon the question of foreign law. (12 Moore, 306.)

The court, thereupon, after a full review of the French reported decisions and text-writers, announced its conclusion that, according to the law of France, it was not necessary, for the purpose of having a domicile which would regulate the succession or form of execution of the will, that any government authorization should be obtained; that the weight of French authority was in favor of the position that the

authorization was not necessary, and there was no one case which decided that it was necessary.

After this judgment had been pronounced, the defeated party tendered further proof that it was not a correct exposition of the French law. For the purpose of obtaining this proof, the president of the Civil Tribunal of the Seine was requested to name the French advocates most competent to form an opinion whether the sentence of the Privy Council did or did not correctly expound the French law. He named ten gentlemen. The admitted facts were laid before them, and they unanimously declared that the will was valid according to the French law. This proof, however, was not admitted by the Privy Council. (4 Phillimore Int. Law, p. 211.)

The opinion of these advocates is set forth in 4 Phillimore International Law, at pages 227, 28. They state that they are positively of opinion that, according to the law of France, the deceased, not having been naturalized nor obtained the authorization according to article 13, she never acquired such a domicil in France as to cause her will or its form to be governed by the law of that country, and that, consequently, if her will was made in conformity with the English law, she did not die intestate.

But since the decision of *Bremer* v. *Freeman*, the question has been finally decided by the French Court of Cassation adversely to the view of the English court and in conformity with the opinion just cited. In the *Matter of Melizet*, which came before the tribunal of Marseilles in May, 1867, that court held, in accordance with the view in *Bremer* v. *Freeman*, that the deceased, a citizen of the United States, having acquired an actual domicil in France, his succession was to be regulated by the French law, though he had not complied with article 13. On appeal to the Court of Cassation, this judgment was, by decree of January 12, 1869, reversed. These cases are reported in Sirey's Collection of Laws and Decisions, 1869, part 1, page 138, and the decrees are set forth *in extenso* in Mr. Lawrence's late Commentaries, in

French, upon Wheaton's Elements of International Law, volume 3, pages 111 to 114.

These decrees clearly state the grounds of decision. That of the tribunal of Marseilles shows conclusively that the deceased was, according to general principles of law, actually domiciled in Marseilles, and holds that it does not follow, from article 13, that, in default of the authorization therein mentioned, a foreigner cannot have an actual and legal domicil in France.

The decree of the Court of Cassation states fully the grounds upon which that court reverses this decision. They are, in brief, that the right to enact laws concerning the transmission of property by succession belongs to every country; that it is the same with respect to laws which establish the conditions and legal effects of domicile, which is nothing more than the place which the civil law assigns to each person for the exercise of his civil rights; that, by the terms of article 13 of the Code Napoleon, foreigners are not admitted to the exercise of all civil rights, and consequently cannot acquire a domicile in France, with all its legal effects, without having obtained the prescribed authorization to establish their domicile there, and continuing to reside there; that Melizet, a citizen of the United States, not having obtained from the government the authority to establish his domicil in France, he could not acquire civil rights and a domicil in France, and consequently the transmission of his estate cannot be governed by the French law, etc.; etc.

The result of this construction of article 13 necessarily is to establish that, according to the French law, the will of the deceased would be regarded by the French courts as valid if executed in conformity with the law of her domicil of origin. The inquiry into domicil becomes unnecessary if it turns out that, with respect to this individual succession, the law of New York and of France is the same, for when we speak of the law of domicil as applied to the law of succession, we mean not the general law, but the law which the country of the domicil applies to the particular case under consideration. (*Maltass* v. *Maltass*, 1 Rob. Ecc. R., 72, per Dr. LUSHINGTON.)

If this particular will is executed in conformity with our own laws, and is also valid according to the law of France, it is difficult to conceive any reason for rejecting it.

The provisions of the French Code are in evidence, but the decisions referred to were not proved. As they relate to the construction of the article which is in evidence, it would seem that we may refer to them as authorities to aid us in construing the article, without going the entire length of the decision in *Bremer* v. *Freeman,* which holds that they may be referred to as showing the law of France upon the subject. We think, however, that we may safely rest our decision upon the ground that, irrespective of the consideration arising upon article 13, no domicile in France was established by the evidence.

The judgment should be affirmed. The questions are not free from difficulty, and have been presented on the part of the contestants, evidently, in good faith. They have been argued in this court with great learning and ability, and are carefully and ably treated in the opinion of the learned surrogate.

We think that the contestants were justified in raising the question, and that, under all the circumstances, the costs of all parties in this court, and the courts below, should be paid out of the estate.

All concur.

Judgment accordingly.