## In re TOWN OF HECTOR.

### In re ZEBEDIO et al.

#### (Schuyler County Court. July 15, 1893.)

PAUPERS—SETTLEMENT—RAILROAD LABORERS—"INHABITANTS."

Italian laborers, who come to the United States in search of work, leaving their families in Italy, and are employed in constructing railroads, liable to be discharged at any time, and free to leave their employment when they see fit, and living in rough shanties built by the railroad contractors, do not gain a settlement in a town in which they work for a year, under 3 Rev. St. (Banks' 8th Ed.) p. 2111, § 29, providing that every person of full age, who shall be "a resident and inhabitant of any town for one year," shall be deemed settled in said town.

Appeal from superintendent of the poor.

The town of Hector was adjudged liable for the support of Nunzio Zebedio and Julian Depowel, paupers, and appeals. Reversed.

C. H. Everts, for appellant.

F. W. Fiero, for respondent.

KEELER, J. In the absence of express statutory provisions, there is no obligation or duty imposed upon towns to contribute to the support of persons residing within their limits. People v. Supervisors of Schoharie Co., 121 N. Y. 345, 24 N. E. Rep. 830. That both of these young men were poor persons or paupers, and that the officials did right in extending them aid, is apparent from even a cursory reading of the statute. 3 Rev. St. (Banks' 8th Ed.) p. 2106, § 14; Goodale v. Lawrence, 88 N. Y. 517. Supt. Shulenburgh found them at the Watkins depot, in the town of Dix, with their mangled limbs, and without a cent of money. In the language

of the statute, they were then "disabled and enfeebled so as to be unable by work to maintain themselves," and were "poor persons." The superintendent promptly did his duty in the premises,—found them a place to board and lodge, and provided them with a physician and surgeon and nursing care. The two young men had been in the town of Hector for over a year, and had been brought from there, after their injuries, into the town of Dix. The superintendent, ascertaining that the town of Hector, through its overseers of the poor, claimed that the men had not gained a settlement in that town, and were not chargeable to that town, discontinued his furnishing them on behalf of the county, and thenceforward they were cared for by the town of Dix, through its poor authorities. The proper notice and denial were given and received pursuant to section 32, Rev. St. (Banks' 8th Ed.) p. 2111, and a hearing had as to the settlement of the men, as between the towns of Dix and Hector, before the superintendent, who made and filed his decision November 14, 1892, adjudging the two men to have a legal settlement in, and a charge upon, the town of Hector. The cases come before this court on appeal from said adjudication of Supt. Shulenburgh by the town of Hector.

It cannot be for a moment claimed, nor was it claimed by any counsel upon the hearing in this court, that either of these men had any legal settlement in the town of Dix. Their first appearance in that town was, in the condition before stated, on June 29, 1892. The sole question presented is, had these young men gained a legal settlement, under our poor laws, in the town of Hector? In Schuyler county the distinction between town and county poor has not been abolished. The towns continue liable, respectively, to support their own poor. In such case the statute provides with reference to support as follows, (3 Rev. St., Banks' 8th Ed., p. 2111, § 31:)

"Every poor person shall be supported in the town or county where he may be, as follows: (1) If he has gained a settlement in any town in such county, he shall be maintained by such town."

The second subdivision provides that if such poor person has not gained a settlement in any town of the county in which he shall become poor, sick, or infirm, he shall be supported and relieved by the superintendent of the poor at the expense of the county. The logic of the statute compels us again to the question, had these men gained a legal settlement in the town of Hector? If they had, the statute says that they "shall be maintained by such town." Whether they had gained such settlement in Hector depends upon the construction given to section 29, same statute. This section reads as follows:

"Every person of full age, who after this chapter shall commence and take effect, shall be a 'resident and inhabitant' of any town for one year, * * * shall be deemed settled in such town."

It will be seen that the whole question turns upon the further question, whether or not the young men were "residents and inhabitants" of the town of Hector, within the meaning of this statute. The two men were natives of Italy. Zebedio had left his native

state—Syrine, Italy—in April, 1890, and had left there a family consisting of a wife, their three children, and his mother, who still remain there. He had no property in this country except his clothing. His family lived in Italy, in a house he had built or bought for them on rented land; and since being in the states he had, from time to time, sent money for the support of his family, and to pay for this house. His exact age does not appear, but he is upwards of 21 years of age. Depowel was 20 years of age at the time of the first hearing,—December 27, 1892. His father lives somewhere in the state of Pennsylvania. Depowel is unmarried, and his mother and four brothers live in Italy. He came to this country from Italy in the month of April, year 1889 or 1890. Both of these young men had actually been located and living in the town of Hector for more than one year immediately prior to their accident and injuries. They had been all of the time at work for the McFaddens, as contractors in building the new branch of the Lehigh Railroad, extending from Van Ettenville, northerly through that town to Geneva, and beyond. The McFaddens, as contractors for the building of that portion of the road extending over what is known as "Breakneck" gully or gorge, through North Hector, employed a very large gang of men, principally Italians and Hungarians, and these men were of the number. Neither of them could speak the English language, and their testimony was taken through an interpreter. In the work the men were known and designated by numbers. Zebedio was No. 200, and Depowel No. 631. Zebedio had worked some two months on railroad work in Connecticut, and then in building a railroad at West Batavia, and came from there to the North Hector job. Depowel swears:

"He says a man came to him, and paid his fare, and he worked and paid the money back. (This is from New York city.) He bring him—he buy him —a ticket, and let him have the money for the ticket; and he come up here and work, and every pay day he pay $10 or $5."

This man's name, he says, was Felicia Stodio. He says they came all together, 20 or 30 of them, and the McFaddens' working boss set them to work. The men received $1.25 per day.

The system of board and lodging the men was this: The McFaddens, the contractors, built in or near the gorge, near the line of the road, one or more buildings of rough boards, called "shanties," each shanty provided with from 20 to 50 bunks, or places for the men to sleep in. An enterprising Italian, who could speak English, rented one of these shanties, and in it kept a general furnishing store, rented the bunks to the men, and sold them material for their eating, which each man cooked for himself, generally upon one of the two large stoves in the center of the shanty; the storekeeper getting his pay for the sleeping bunks, and the food and clothing furnished the men, direct from the contractor, each pay day.

Were these men "residents and inhabitants" of the town of Hector? If not, they had gained no settlement there. The question is complicated from the lack of adjudged cases defining who are "residents and inhabitants," within the meaning of our

poor laws, and the great mass of decisions existing as to the meaning of the words when occurring in other statutes. "Gaining a settlement" in a township, so as to receive the support of the town authorities in case the person became poor and unable to support himself, has always been considered by the laws of England, and of the different states, as a great and important individual privilege, and has been carefully guarded by statute; and, as is said in opinion of the court in Lewistown Overseers v. Granville, 5 Pa. St. 283, "In England and in this country, with respect to gaining a settlement, courts have been critical and exact." In many of the states a much longer time of continuous residence than one year is required. Prior to the Revised Statutes of 1827, except in the case of mariners, and healthy, able-bodied foreigners, coming direct from some foreign port, the time was longer than one year in this state, and was hedged about with conditions, such as renting lands, paying taxes, being bound as an apprentice, etc. In the case of Wynkoop v. Overseers, etc., of City of New York, (decided in 1808,) 3 Johns. 14, Sarah Warring had removed from Stamford, in the state of Connecticut, to the city of New York, about May 1, 1801. She lived there continuously from that time until January, 1805. She lived there with her brother-in-law, and in the capacity of a domestic servant, without any specific time of service or specified price agreed upon, although there was a verbal agreement that she should receive wages. She had not been bound as an apprentice or servant to any one in the city. It was held that her legal settlement still remained in Stamford, Conn.; that she had not gained a new settlement in New York city. The court, (Spencer, J.,) says: "And her residence in New York was not of that kind as to acquire a legal settlement there." The case of Henrietta Tp. v. Brownhelm Tp., 9 Ohio, 77, was under the then Ohio statute, under which a settlement would be gained by one year's residence without being warned by the overseers of the poor to depart the same, or three years' residence after being once so warned without being again so warned. It was held that such residence must be "continuous and notorious, and attended by such circumstances as to lead the authorities of the town, in the exercise of proper vigilance, to the conclusion that there is an intention to gain a settlement." The case of Town of Salem v. Town of Lyme, 29 Conn. 75--80, was under the then Connecticut statute, which provided for settlement to be gained by residence in a town for six years, successively, after his or her removal into such town, supporting himself or herself. Hinman, J., delivering the opinion, states what kind of a residence is necessary to inaugurate the six-year term. He says:

"When a domicile is once acquired by a residence for an indefinite time, with an intention to continue the residence indefinitely, the statute applies to the case. The residence which the statute contemplates as sufficient to gain a settlement, if it is continued for six years, has commenced."

The case of Lewistown Overseers v. Granville, 5 Pa. St. 283, was under a Pennsylvania statute which provided that an unmar-

ried female, without a child, who shall be lawfully bound or hired as a servant, and shall continue such service one year, should gain a settlement in the town of such service. The woman in question had lived in the family of one Shrimp for 14 months. She had her board and clothes, and did what work she was asked, but there was no agreement or contract that she should have pay or wages; and the court held that she had not gained a settlement, within the provisions of the statute.

These cases are, perhaps, enough to show the trend of statutes and decisions in other states. In our own state, as we said, there are no decisions as to who are residents and inhabitants, under this statute; and we are forced to reason from the general meaning of the words, and the construction placed by our courts upon the same words when used in other statutes. Webster defines an "inhabitant" as—

"A dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor; as, the inhabitant of a house or cottage; the inhabitants of a town, county, city, or state, etc."

"Resident" is a flexible word, having different meanings, according to the context. The author of the American Encyclopedia of Law (volume 10, p. 770) says of the word:

"This is a word with a great variety of meaning. The necessary element in its signification is 'locality of existence.' The permanency of the residence indicated, however, depends in a great degree upon the context. The word has been variously construed to mean an occupier of lands; a resident; a permanent resident; one having a domicile; a citizen; a qualified voter. The construction is generally governed by the connection in which the word is used."

We do not see any well-founded distinction between "inhabitancy" and "domicile," when applied to the statute under consideration. The cases where a distinction is most broadly stated are those where attachments have issued on the ground of the nonresidence of a debtor. Notably, In re Thompson, 1 Wend. 45. But in that case, and in all that class of cases, the distinction was recognized or created in order to reach absent debtors, who could not be served with process. As stated by Gardiner, J., in Haggart v. Morgan, 5 N. Y. 428, (referring to the Thompson Case:)

"It was there held that his residence might be abroad, within the spirit of the statute, which was intended to give a remedy to creditors whose debtors could not be served with process, while his domicile continued in this state."

For this reason, we do not regard the decisions in attachment cases as the most reliable ones in the construction of the meaning of the words in question. The cases as to assessments of taxes also furnish a very imperfect guide, as in Bell v. Pierce, 51 N. Y. 13, it is held that, for some purposes of taxation of personal property, a person may have two places of residence, (one for winter, and another in the summer,) though but one domicile. We find the words often in the constitution of the United States. A representative in congress must be an inhabitant of the state. Const. U. S. art. 1, § 2, subd. 3. And so senators of the United States. Id. § 3, subd. 3. And the president and the vice president shall not,

both of them, be inhabitants of the same state. Id. art. 12. And our state's constitution (Id. art. 3, § 4) provides for an enumeration of the inhabitants of the state every 10 years.

The class of cases furnishing the best analogy, as it seems to me, are those where the jurisdiction of the court in the particular case depended upon the fact of residence or inhabitancy of one or both of the parties in a particular town or county. The early case, In re Wrigley, an insolvent debtor, reported (supreme court) in 4 Wend. 602, and (court of errors) 8 Wend. 134, furnishes a good illustration. The statute provided that every person applying for a discharge under the insolvent law must make his application in the county of which he was an "inhabitant." The question arose whether Wrigley was an inhabitant of New York city. If not, the court could not grant him a discharge. The question is quite thoroughly discussed by Chief Justice Savage in the supreme court, and by Chancellor Walworth and Senator Allen in the court of errors. The substance of the decision is that a mere sojourner or lodger is not an inhabitant; and the word means "a fixed and permanent abode or dwelling place for the time being, as contradistinguished from a mere locality of existence."

Probate cases furnish an excellent analogy. In the case of Ishan v. Gibbons, 1 Bradf. Sur. 79–93, Surrogate Alex W. Bradford exhaustively discusses the question and reviews the cases. Thomas Gibbons died in New York city, May 16, 1826, and the question at issue was whether he was then an inhabitant of that city. The surrogate, after speaking of the loose construction given to the words in attachment cases, (before noted,) says:

"I have not been referred, however, to any authority which tends to show that, in statutes relating to testamentary matters, the word 'inhabitant' or 'resident' is to be taken in a limited sense, so as to mean actual residence, in contradistinction to domicile."

And again (page 82) the surrogate says:

"So far as our own constitution and laws speak of 'residents,' the idea of a fixed and permanent dwelling generally seems to be involved. Thus, in the qualifications of citizenship, and in the laws relating to taxes, the militia service, and the settlement of the poor, 'residents' and 'inhabitants' are mentioned as convertible terms."

Again, (same page:)

"The constitutional definition of 'habitancy' is the place where a man dwells, or has his home; in other words, his domicile."

Kennedy v. Ryall, 67 N. Y. 380, was another probate case. The jurisdiction of the surrogate to issue letters depended upon the question whether or not the intestate was, at the time of his death, an inhabitant of the city of New York, within the meaning of the statute. The intestate's father (intestate being an infant) had previously resided in England, but had been in New York city about seven months, and his wife and child came over to join him, and live with him, in New York. He had located and was at work in New York. He testified he came there to make a home and a living. He was held to have been an inhabitant of New York city. Miller, J., says, (opinion of court, page 386:)

"Generally speaking, 'domicile' and 'residence' mean the same thing; and an inhabitant is defined to be one who has his domicile in a place, or a fixed re idence there."

It will be noted in this case that the intestate lived with his family in New York, and intended making a home there.   In the language of the decisions, "the act and intent both concurred."

The first case to define, in simple language, a reasonable guide to the meaning of the words when occurring in a statute is People v. Platt, 117 N. Y. 159, 22 N. E. Rep. 937.   Danforth, J., delivering the opinion of the court, says, (page 167, 117 N. Y., and page 938, 22 N. E. Rep.:)

"The relation is one which has a legal sanction, and in some cases secures its possessor a settlement and pauper privileges under the poor laws; and, in *all cases where a statute provides residence as a qualification for the enjoyment of a privilege* or the exercise of a franchise, *the word is equivalent to the place of domicile* of the person who claims its benefit."  (The italics are mine.)

The question came again before the court of appeals in De Meli v. De Meli, (April term, 1890,) 120 N. Y. 485, 24 N. E. Rep. 996. It was an action for limited divorce, and the jurisdiction of the court depended upon the question whether or not De Meli was or was not a resident of the state of New York, within the meaning of the statute granting the court jurisdiction in such cases.   The answer of the defendant denied that he was such resident.   Bradley, J., writing the opinion, says, (page 491, 120 N. Y., and page 998, 24 N. E. Rep.:)

"The question here has relation to the legal residence of the parties, and, within the meaning of the statute providing for actions of this character, the place of which the parties are residents is that of their permanent abode, which may be distinguished from their place of temporary residence. In legal phraseology, 'residence' is synonymous with 'inhabitancy' or 'domicile.'" "The purposes for which residence is not determined by domicile are those within the contemplation of some statute."

The learned judge names the statutes for levy of attachments and assessments of taxes on personal property as illustrations, and adds:

"Then, and for the purposes of such remedy and taxation, the place where the party actually resides may, as has been held, be treated as that of his residence, although his domicile is elsewhere."

It seems to the court that these cases may be regarded as establishing the legal proposition that the words "resident and inhabitant," in the statute under consideration, mean a locality of existence as permanent and firmly fixed as is legally conveyed by the word 'domicile,' and that at once disposes of this appeal.   It has long been settled law that every person has a domicile somewhere. If he has not acquired one elsewhere, he retains his domicile of origin, and to effect a change of domicile the fact and intent must concur; that is, there must be, not only a change of residence, but an intention to abandon the former domicile, and acquire another as the sole domicile.   Dupuy v. Wurtz, 53 N. Y. 556; De Meli v. De Meli, 120 N. Y. 491, 24 N. E. Rep. 996.   Rapallo, J., states the rule clearly in the Dupuy Case, 53 N. Y. 556.   He says, (page 561:)

"There must be both residence in the alleged adopted domicile, and intention to adopt such place of residence as the sole domicile."

The trouble with these two young men gaining a settlement in the town of Hector is, there is no evidence of an intention on their part to make that town their home. Indeed, it would be absurd to claim that either of them had any such intention. They came to this country to work on railroad work, and have been so employed all of the time since arriving in the United States, up to the time of their injuries. When one railroad job was finished, they have gone to another. They were not employed for any definite time. They were liable to be discharged at any moment. Each could leave the work when he had a mind to, and after a certain time a new man took the same number. The fact that the job kept them on Hector soil more than one year does not alter their status. Their manner of lodging, eating, and obtaining their supplies, all show that the stay of the men in Hector was intended to be temporary, and only during the continuance of the railroad work. Outside of the unmistakable inference from their acts, Zebedio's testimony shows that he had no fixed intention of making his permanent home in Hector. He says that he had not yet made up his mind not to go back to Italy. Whether he would go back or not depended upon whether or not he could learn to speak the English language. His wife, children, and mother live in Italy, and he sends them money for their support. It seems to the court that with about as much reason it might be claimed that "Gipsy Josh" and his band become residents and inhabitants in the place where they locate their palace sleeping coaches, tents, dogs, and horses, for a temporary sojourn, which should be prolonged to 13 months by reason of sickness or some other unforeseen occurrence, as to claim that these temporary sojourners became "residents and inhabitants" of the town of Hector.

The question is not before this court as to whether or not these men were state paupers, within Laws 1873, c. 661, § 1, amended, as to other sections, by Laws 1874, c. 464. Section 1 of the act of 1873 provides that—

"Every poor person who is blind, lame, old, impotent, or decrepit, or in any other way disabled or enfeebled so as to be unable by work to maintain himself, who shall apply for aid, * * * and who shall not have resided sixty days in any county of this state within one year preceding the time of such application shall be deemed to be a state pauper, and shall be maintained as hereinafter provided."

Judgment must be given in favor of the town of Hector upon the appeal as to both Zebedio and Depowel, with costs of the appeal against the town of Dix. Inasmuch as the cases are so nearly alike, and the preparation for trial and argument substantially the same in each, only one bill of costs should be allowed.