(Surrogate's Court, New York County, December, 1901.)

1. WILLS—MENTAL CAPACITY.
    A holographic will disposing of personalty was attacked on the ground
    that the testator was ill with a disease accompanied by paralysis of
    speech and of the limbs, and a gradual weakening of the powers, accom-
    panied with tremulousness of the hands, but the handwriting did not
    exhibit much tremulousness or physical decay. *Held*, that the will would
    be admitted to probate.

2. DOMICILE—ABANDONMENT.
    Testator, after divorce in 1887, left his legal domicile in the city of
    New York, and went to London where he was married. After return
    and a brief stay in New York, he went to Europe. Finally, in 1894,
    he departed from his wife, leasing a house in France, where he lived
    until his death in 1898. His means of support came from his property in
    New York. Declarations were shown of an intent to remain and die in
    France, and a desire to be buried in France beside his mother. *Held*
    sufficient to show an election to live and die in France, and to abandon
    his American domicile.

3. WILL—REASONABLENESS OF PROVISION.
    Testator, leaving three legitimate children, by his will made his mis-
    tress of seven years' standing universal legatee. The Civil Code of
    France (of which deceased was a resident, though an American citizen)
    art. 913, provides that donations by will cannot exceed one-fourth where
    testator leaves three or a greater number of legitimate children. *Held*,
    that the provision in view of the French law, whereby the legatee would
    receive only one-fourth of his estate, was not unreasonable.

Proceedings on the contested probate of the will of Eugene G.
Cruger. Probate allowed.

Ward, Hayden & Satterlee, for general guardian, contestant.
Charles E. Lydecker (J. Hampden Dougherty, William Morton
Grinnell, and Francis M. Appelgate, of counsel), for proponent.

THOMAS, S. The paper propounded for probate as a will of
personal property is in holographic form and without witnesses. It
is dated at Fontainebleau, France, on May 29, 1896, and is in the
French language, and purports to constitute the proponent the "un-
iversal legatee" of the decedent, and to leave to her his entire estate.
The decedent died at Fontainebleau on April 4, 1898, being then about
42 years of age. The proponent had lived with him as a wife for about
six years before his death, but was never married to him, and during
the whole of that time he had a wife. The contestant is the general
guardian of three children by his first marriage. It is quite clear
that the propounded paper does not in any way conform to the re-
quirements of the law of this state as to its method of execution,
and it can be sustained, if at all, only as a French will, executed in
France by a resident of that country. By the law of France "a
holographic will shall not be valid unless it is wholly written, dated
and signed, in the hand of the testator. It is not subject to any
other formality." Civ. Code France, art. 970. On the part of the
proponent it is alleged that the paper in question was wholly written,

signed, and dated by the decedent, and the contestant endeavored to establish that it was in all respects a forgery. On this issue I must determine in favor of the genuineness of the document. The proof is that it was handed for safe-keeping by the decedent to a French notary in the fall of 1896, and that he spoke of having made such a will to other persons. The notary was a public officer, one of whose principal duties was to act, as a custodian of papers affecting rights of property. He is not impeached, and it is not shown that he would have served his personal interests by becoming a party to a conspiracy to concoct or enforce a forged will. The evidence against the paper was mainly that of persons familiar with his handwriting and of experts in handwriting, and testimony of a similar kind was also offered by the proponent. The expert testimony was interesting, and served to direct my atention to the peculiarities of the penmanship of the decedent, and led me to a close examination of the disputed paper. After such examination, and after making a comparison of the writing in question with the other writings shown to be genuine, I am of the opinion that the paper propounded was written by the decedent. The testamentary capacity of the decedent was also called in question. On this issue the testimony offered is entirely incapable of being harmonized. The decedent, at some time prior to 1896, became affected with a disorder of some kind, which was progressive in its effects, and which finally ended in his death in April, 1898. Among the symptoms were a paralysis of speech and of the limbs, and a gradual weakening in physical and mental power. Tremulousness of the hands, inducing a shaking handwriting, was also a symptom. As to this general condition the witnesses are in substantial accord, but as to whether, on April 29, 1896, the disease had so far advanced as to make the decedent incapable at that time to make an intelligent disposition of his estate, the differences are radical. The great bulk of the evidence is in favor of testamentary capacity. I am also aided by the instrument itself, which shows intelligence in construction, and the writing of which does not exhibit much of tremor or physical decay. I decide that the decedent had sufficient testamentary capacity. No proof was offered on which a finding that the paper was procured fraudulently or by undue influence could be based. The fact that the chief beneficiary was the mistress of the testator might have weight under some circumstances, though not all controlling; but, under all of the facts appearing, the paper is not at all unreasonable, and may fairly be inferred to express the wishes of the decedent.

By section 2611 of the Code of Civil Procedure, "a will of personal property, executed by a person not a resident of the state, according to the laws of the testator's residence, may be proved as prescribed" by our statute. If, therefore, Mr. Cruger was, at the time of making the paper in question, not a resident of this state, but a resident of Fontainebleau, in France, and continued so to be a resident of France to the time of his death, and the paper propounded was executed according to the laws of France, it must be admitted to probate here as a will of personal property. In determining these ques-

tions the terms "resident" and "residence," as used in our statute, must be used in the sense in which those words were used by our legislators and as defined by our courts. As so used, a resident of a place is an inhabitant of that place who has a fixed intention to remain there. The "residence" must be equivalent to "domicile," and must include both actual residence and intention. Dupuy v. Wurtz, 53 N. Y. 556; Mitchell v. U. S., 21 Wall. 350, 22 L. Ed. 584; Moorhouse v. Lord, 10 H. L. Cas. 272. It is, however, something less than or different from citizenship or nationality, and a citizen of the United States and of the state of New York may well be a resident of any other country in the world. Dupuy v. Wurtz, supra. Mr. Cruger, the decedent, was born in Florence, Italy, in 1856, his parents being American citizens, who were married in Europe, and who continued to reside there until they died; the father in 1866, and the mother in 1873. He was educated in France until the outbreak of the Franco-Prussian war in 1870, when he was brought to America. He received some schooling at Peekskill, in this state, and in 1872 he was appointed a cadet at the United States Naval Academy at Annapolis, as an American citizen, residing in Dutchess county, N. Y. He was discharged from the naval academy in 1873, and then went to Europe to join his mother. His mother died in that year, and he was again brought to America. He was first in Dutchess county, with relatives, and subsequently came to New York City, where he was residing when he reached his majority, in 1877. He was for a time a clerk in his uncle's real estate office in this city, and for some years prior to 1880 he was an officer in the national guard of the state of New York. In 1880 he was married, and went to live in the residence of his father-in-law in the city of New York. In 1881 he registered as a voter in the city of New York, and voted at the election held during that year. He continued to reside in this city for several years, during which time his three children, the contestants in this proceeding, were born. In January, 1887, the marriage between him and the mother of the contestants was dissolved by a judgment of the supreme court of the state of New York in an action brought by her on statutory grounds, and the custody of the infant children was awarded to her. These facts require the inference that up to January, 1887, Mr. Cruger was legally domiciled in this state. The question is then presented whether that domicile was lost and a new domicile was acquired by his subsequent acts. After his divorce, and in March, 1887, Mr. Cruger was married for a second time in London, to a lady whose home had been in New York. Shortly after his second marriage he returned with his wife for a brief stay in New York, but shortly went with her to Europe, where they lived a more or less roving life, traveling about Europe, in a villa at Paris, and in a hotel at Fontainebleau, until about 1891, when a separation was had between them. Mr. Cruger then seems to have formed his relation with the proponent, and he thereafter lived with her until his death. For a year or more the couple appear to have traveled from place to place, living in hotels and furnished lodgings, mainly

in France.    In March, 1893, Mr. Cruger hired a furnished house
known as "The Madeleine," at Fontainebleau, for a term ending with
October of that year.    After the expiration of that lease he made
a trip to Africa with the proponent, returning to Fontainebleau in
the spring of 1894, when he took a new lease of "The Madeleine"
from May 15 to November 1, 1894.    The winter of 1894–95 was
spent elsewhere, but in May, 1895, Mr. Cruger leased a furnished
house at Fontainebleau for a year from June 1, 1895.    This lease
seems to have been renewed from time to time.    The feeble health
of Mr. Cruger, or some other reason, seems to have induced him
to refrain from traveling, and in this house he died on April 4,
1898.    In these furnished houses at Fontainebleau Mr. Cruger gath-
ered the souvenirs of his travels.    He supplied himself with horses
and carriages and dogs.    He superintended the cultivation of his
garden, and amused himself with driving and with riding.    His
means of support always came from his uncle in New York, who
managed his estate; but he was greatly attached to France and to
French methods of living, and he was very fond of his home at
Fontainebleau and of its surroundings.    His declarations of intent
to remain at Fontainebleau for the rest of his life, and the expres-
sions of his wish to be buried in France beside his mother, were
made to so many people that I must find as a fact that he had elected
to live and to die there, and to abandon his American domicile.
In the French law the term "domicile," in the fullest sense of that
term as there used, means something in the nature of nationality
or citizenship, and can only be obtained by an authorization by a
decree.    French Civ. Code, art. 13.    In the absence of such decree,
a foreigner resident in France remains an alien for some purposes,
other than political, no matter how permanent the character of
his establishment, or how fixed his intention of remaining.    There
is, however, a sort of domicile recognized and called a "domicile
de facto," which is substantially identical with our "domicile."    A
person residing in France, though not a citizen, and never having
taken any step to become a citizen, if his residence has been with
intent to make France his home and fixed abiding place, is domiciled
there "de facto," and certain legal results follow.    Among these is
that after his decease the administration of his estate found in
France is submitted to the tribunals of the place of his principal
establishment in France, and the validity of his will, considered as
to its form and manner of execution, is to be there determined.
The French law does not impose any condition of nationality or
residence in order that a will may be valid.    In the language of
the French Civil Code, "every person can dispose of his property
by will."    Article 967.    The form of execution, permitting holo-
graphic wills without witnesses, is the same for citizens and aliens,
residents and nonresidents; and the application of the French law
to such wills is conditioned only upon the fact that the testator
must have died in France, leaving property there.    The fact of
domicile seems to be important mainly for the purpose of determin-

ing the judicial forum in France which is to direct as to administration of the estate and pass upon disputed questions.

It must be borne in mind that the only question before me at this time is the validity of the propounded paper as a will. No question of distribution of the estate of the decedent on the theory that he died, either in whole or in part, intestate, is presented; and, since the questions which would control such distribution have no bearing upon the principal issue, they will not be discussed. The law of this state and the law of France agree in granting to the owners of property a right to transfer such property by will. In the face of a valid will, next of kin have no rights to share as distributees under any law. By our statute now in force, a will of personalty, executed in conformity with the law of the place of residence of the testator, is valid. Decisions of courts based upon earlier and now obsolete statutes cannot aid us. We may not speculate upon the wisdom of our law when confronted with a plain duty to apply it. I, therefore, determine that the propounded paper was "executed by a person not a resident of the state, according to the laws of the testator's residence," and that it must be admitted to probate as a will of personal property. Code Civ. Proc. § 2611. It must, however, be limited in its effect to grant to the beneficiary named in it no greater rights than the law of France, to which it owes all of the force that it has, gives to it. In the language of section 2694 of the Code of Civil Procedure, the "force and effect" of the testamentary disposition of his personal property "are regulated by the laws of the state or country of which the decedent was a resident at the time of his death." By the French Civil Code, "advantages resulting from donations inter vivos or from wills cannot exceed one-half of the property of the person who has made such dispositions, if he leaves only one legitimate child at his death; one-third if he leaves two children; one-fourth if he leaves three or a greater number." Article 913. Mr. Cruger left three legitimate children, the contestants in this proceeding. The force and effect of the testamentary provision in the paper to be admitted to probate is to give to the beneficiary therein named one-fourth of the personal estate and property of which he died possessed, and no more, and the decree will so adjudge and declare. No executor is named in the will, and the question as to who is entitled to administration must be determined on an independent application. Settle findings and decree on notice.

Decreed accordingly.