(83 Misc. Rep. 257.)

## In re GRANT'S ESTATE.

(Surrogate's Court, New York County. December 9, 1913.)

1. TAXATION (§ 867*)—TRANSFER TAX—DOMICILE.

That the executrix filed an affidavit with the transfer tax appraiser, alleging that testator died a resident of New York City, and that his will was probated in New York county as that of a resident of New York, was not conclusive that testator's last domicile was in New York so as to render his estate liable for payment of the transfer tax under the New York laws.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1681–1684; Dec. Dig. § 867.*]

2. TAXATION (§ 867*)—DOMICILE OF TESTATOR.

An executrix cannot change the actual domicile of the testator by her own admissions after testator's death, nor can she do so by her own acts, even if amounting to an estoppel as against herself.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1681–1684; Dec. Dig. § 867.*]

3. DOMICILE (§ 1*)—PRIVATE LAW.

The principle of domicile, when applied to the conflicting pretensions of the internal laws of different sovereign states, is a part of private international law, but when applied to the conflicting pretensions of imperfectly sovereign states of the same empire it is more properly classed as under conflict of laws.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 1; Dec. Dig. § 1.*]

4. DOMICILE (§ 2*)—WHAT CONSTITUTES—RESIDENCE.

"Domicile" is a modern doctrine quite distinct from "origo" and "residence" of the Roman law, which applied only to a person's connection with an urban community, while domicile is now applied to a person's permanent location within a sovereign state or territory irrespective of cities and towns, and consists of both animus and factum.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 2; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 3, pp. 2168–2179; vol. 8, pp. 7641–7642.]

5. DOMICILE (§ 4*)—CHANGE—TIME.

Where a person abandons his former domicile of choice and, with intent to take up a new domicile of choice, starts toward the new, the change of domicile takes place the moment he puts himself in motion, though, if the domicile left is the domicile of origin, proof of arrival at the new domicile must be made in order to constitute a change.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 5–23; Dec. Dig. § 4.*]

6. DOMICILE (§ 1*)—DETERMINATION—ADMINISTRATIVE MATTERS.

In administrative matters concerning the elemental facts of taxation or the succession of estates, the sovereign states of the federal union will inter se determine, each for itself, the principle of domicile which it will enforce.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 1; Dec. Dig. § 1.*]

7. DOMICILE (§ 4*)—DOMICILE OF CHOICE—TERMINATION—NEW DOMICILE.

A domicile of choice may cease without a new domicile of choice being acquired.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 5–23; Dec. Dig. § 4.*]

8. DOMICILE (§ 4*)—ABANDONMENT—EFFECT.

When a domicile which has been abandoned was itself acquired by choice, the intention may be limited to that of abandoning it, since, if no

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

intention be directed toward the acquirement of a different domicile, the domicile of origin will be reacquired by reverter on the occurrence of the necessary fact, which consists merely in leaving the country in which a domicile has been acquired.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 5–23; Dec. Dig. § 4.*]

9. DOMICILE (§ 5*)—MILITARY OFFICERS.

In general the domicile of military and other officers is fixed by the law of civilized nations at the place where the functions must be discharged.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 24–35; Dec. Dig. § 5.*]

10. DOMICILE (§ 5*) — TRANSFER TAX — MILITARY OFFICERS — FEDERAL TERRITORY.

Testator became an officer in the United States army in 1871, and continued in the service until 1881, when he resigned. Shortly thereafter he became domiciled in New York City and was appointed police commissioner in that city, in which position he served from 1894 to 1898. In 1899 he was appointed a brigadier general of volunteers, and after his discharge he was appointed major general in the United States army, and from 1902 to 1904 had his headquarters at Ft. Sam Houston, Tex. From 1904 to 1908 he was Commander of the Department of the East with headquarters at Governor's Island in New York Harbor. From 1908 to 1910 he commanded the Department of the West with headquarters at Chicago. And from 1910 to his death his headquarters were again at Governor's Island. He resided wholly at his headquarters and had no residence elsewhere, but while on official business in Washington expressed an intention of buying a house in the District of Columbia and making it his permanent home. He selected a house, but did not purchase or rent it, and did nothing more than ship some household furniture and his uniforms to Washington, when he died while temporarily at a hotel in New York City on his way south. *Held*, that testator's domicile was within federal territory, to wit, Governor's Island, and not in New York, at the time of his death, and that his estate was therefore not subject to transfer taxation under the laws of that state.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 24–35; Dec. Dig. § 5.*]

11. DOMICILE (§ 5*)—MILITARY POST—JURISDICTION OF STATE.

That the state of New York has concurrent jurisdiction with the federal authorities in a few instances at Governor's Island does not make such island any the less federal territory, so that a citizen of the United States residing there may have a federal domicile as contradistinguished from a domicile in New York.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 24–35; Dec. Dig. § 5.*]

12. TAXATION (§ 893*)—TRANSFER TAX—DOMICILE—BURDEN OF PROOF.

In a proceeding to assess testator's estate for transfer taxation, the burden is on the state to prove that testator was domiciled within the state at the time of his death.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 893.*]

Proceeding for the appraisal of the estate of General Frederick Dent Grant, U. S. A., for assessment of transfer tax. Dismissed.

Thomas E. Rush, of New York City (George Thoms, of New York City, of counsel; Theodore du Moulin, of New York City, on the brief), for State Comptroller.

William A. Purrington, of New York City, for executrix.

*For other cases see same topic & §·NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

FOWLER, S. This is a proceeding to appraise the estate of the late Gen. Frederick Dent Grant, U. S. A., in accordance with the provisions of the Transfer Tax Law. The executrix contends that at the time of his death Gen. Grant was not domiciled in the state of New York. If this contention is correct his estate is not subject to a transfer tax in this state. The appraiser refused to tax the estate, and the comptroller now appeals to the surrogate. The appraiser had no power to determine the domicile of Gen. Grant. N. Y. Law Journal, 14th of November, 1913.

Certain affidavits in regard to the question of Gen. Grant's domicile were filed with the transfer tax appraiser on behalf of the estate, and by a stipulation entered into between all the parties to this proceeding it was agreed that these affidavits contained all the evidence that either side desired to offer upon the question of domicile, and that the surrogate should proceed to determine that question upon the affidavits submitted to the appraiser. From these affidavits it appears that Gen. Grant was born in Missouri in 1850; that subsequently he resided at Washington with his father, who was then President of the United States; that he became an officer of the United States army in 1871 and continued in the service until 1881, when he resigned. It is apparent that a short time after his resignation from the army he became domiciled in New York City. He was police commissioner in this city from 1894 to 1898. In 1899 he was appointed a brigadier general of volunteers, and after his discharge from the volunteer service he was appointed major general in the United States army. In his will, which was executed in Texas in 1903, he described himself as "at present an officer in the United States Army stationed at Fort Sam Houston, Texas." From 1902 to 1904 his headquarters were at Ft. Sam Houston, Tex.; from 1904 to 1908, as Commander of the Department of the East, his headquarters were at Governor's Island in New York Harbor; from 1908 to 1910 he commanded the Department of the West, with headquarters at Chicago; and from 1910 to the date of his death his headquarters were again at Governor's Island. He resided wholly at his headquarters, and had no residence elsewhere. It further appears that while residing in federal territory at Governor's Island, and also while on official business in the city of Washington, Gen. Grant expressed an intention of buying a certain house in the District of Columbia and making it his permanent home; but, while he selected a house, he did not either purchase the house or rent it. He, however, shipped some household furniture and his uniforms to Washington, but it does not appear that they were delivered at a house purchased or rented by him. Shortly thereafter he died while sojourning at the Hotel Buckingham, in the city of New York, temporarily, on his way to the South.

[1] The executrix, in an affidavit verified October 19, 1912, and filed with the transfer tax appraiser, alleged that Gen. Grant died a resident of the city of New York. This is not, however, final, and she now contends that his expressed intent to make Washington his permanent home, coupled with the sending of household furniture and clothing to that city, constituted him a resident of Washington and

made that place his domicile. It appears that his will was probated in this county as that of a resident of the state of New York. But these things are not conclusive upon the question of Gen. Grant's last domicile. Flatauer v. Loser, 156 App. Div. 591, 141 N. Y. Supp. 951.

[2] An executrix cannot change the actual domicile of the testator by her own admissions after testator's death, nor can she do so by her own acts, even if amounting to an estoppel as against herself. Such acts and admissions are beyond the province of executors in such matters as this.

It appears that Gen. Grant at the time of his death was an officer in the regular army of the United States. The domicile of military men is often more difficult for the courts to determine than is the domicile of those in civil life. The adjudications bearing on the principle of domicile, applicable to nonmilitary persons, are not, I think, always relevant in cases involving the principle of domicile as it is applied to military or naval men. Such seems to be the opinion of foreign jurists and courts. Now, on all questions involving the principle of domicile it is conceded that a consensus of opinions of foreign jurists on any one point ought to have great weight in fixing the municipal rule of domicile. Dicey has explained the reason which occurs to him why such consensus is of weight (Conf. of Law, 21), and there are still other reasons which he does not state and which I venture to think are even more accurate and certainly more applicable to complicated jural and modern conditions. I may add that no department of jurisprudence has of late undergone and is undergoing greater modifications than that which in primitive times regulated the principle of domicile.

[3, 4] This matter involves the principle of domicile. The principle of "domicile," when applied to the conflicting pretensions of the internal laws of different sovereign states, is a part of private international law. When applied to the conflicting pretensions of imperfectly sovereign states of the same empire, it is more properly classed as a branch of the body of the law styled "conflict of laws." A more extended discussion of the principle of domicile than is usual in a single litigated case is, I think, desirable in this matter, which presents special features made more clear by a general survey. The principle of domicile was not at first distinguished in the cases from citizenship and territoriality. "Domicile," as the jurists hold, is a modern doctrine, quite distinct from "origo" and "residence" of the Roman law, and also distinct from the later territorial conceptions, and with this opinion I make bold to concur. It was Savigny, I think, who first made clear that the theory of origo and domicilium in Roman law applied only to a person's connection with an urban community. That domicile is now a principle outside of the old doctrines of territoriality is both certain and sure.

In the instance of soldiers and sailors, what common lawyers now term "domicile of origin" is generally controlling in the absence of very positive proof. Lauderdale Peerage, L. R. 10 App. Cas. 692, 738; s. c., 17 Abb. N. C. 439. Doubtless, a military officer as well as another may change for himself his domicile of origin to a new domicile called "a domicile of choice," which then for juridical and admin-

istrative purposes takes the place of the domicile of origin. This now inherent right of change Gen. Grant exercised when a civilian, and his domicile of origin, to wit, Missouri, was changed to a domicile of choice, to wit, New York. His first domicile of choice, prior to the year 1900, was in the state of New York. The principle of domicile, it should be observed at this point, relates wholly to territory and not to cities or towns. Gen. Grant's residence was then in the city of New York; his domicile in the state of New York. The question here does not concern Gen. Grant's first domicile of choice, but concerns his subsequent domicile, after he had again entered the regular army at the close of the Spanish War. Now, I take it that a domicile of choice, in the instance of a military officer, is to be resolved on very different considerations from those controlling in the instance of a nonmilitary man. In the last edition of his work on Private International Law, Westlake has some very weighty observations on the general principles controlling domicile (chapter 14). Westlake demonstrates what is conceded in the courts of this state (Dupuy v. Wurtz, 53 N. Y. at page 562), that the principle of domicile depends wholly on the facts of any given case, and also that it is broad enough to involve very complicated and conflicting situations. Westlake's general observations are both wise and acute. The general observations of a great publicist on a question of this character are entitled to respectful consideration in the private courts of all countries, while in the public courts they are often controlling.

It is constantly repeated in the books of the law that the acquisition of a new domicile depends on both intention (animus) and residence (factum), and also that a change of domicile can be effected only by a combination of intention and fact, animo et facto. While these are accurate expressions, they are not comprehensive; the real difficulty always in a case of this character is: What establishes animus and what constitutes factum? Animus (intention) may be either matter of fact or matter of law; that is to say it may be proved as an independent fact, such as by a declaration spoken or written of the "de cujus," or it may be presumed as matter of law from habitance inconsistent with any other intent than animus manendi. So the element termed factum may be made out by actual or constructive residence; that is to say, residency may be matter of fact or matter of law. To assume that proof of animus without proof of actual habitance or residence in a particular city or town is never enough to establish domicile, is to mistake the principle of domicile, or to reduce it to a rigid formula, inconsistent with jural necessities.

[5] The jurists of the world entertain much more delicate conceptions of the principle of domicile than those just stated; e. g., in a case where a person abandons his former domicile of choice, and, with intent to take up a new domicile of choice, starts toward such new domicile of choice and dies in itinere. I do not understand that the American private courts intend to deny the truth of the accepted doctrine of the publicists of the world and hold that the new domicile of choice to which the man is journeying is not complete the moment he so puts himself in motion. Nor do I understand that our private courts

deny that this rule would be entirely different if the domicile so left had been a domicile of origin, for in such a state of fact it is conceded that arrival at the new domicile of choice must be established, or the domicile of origin still prevails. These are but some of the many delicate applications of the principle of domicile. I am aware that it is sometimes said that the courts of this country do not recognize the English rules governing domicile on some points. Plant v. Harrison, 36 Misc. Rep. 649, 656, 74 N. Y. Supp. 411, quoting Jacobs, Domicile, § 114. Certainly an English rule of domicile is important only when it states a principle of domicile of universal operation. Notwithstanding such statements of our American courts, I am not persuaded that there is in this country any deliberate policy or intention to repudiate generally established rules of private international dealing on any point.

[6] I think what is intended to be held in the American cases which appear to depart from established rules is that in administrative matters, concerning the incidence of taxation or the succession to estates, the sovereign states, composing the United States, will inter se determine each for itself the principle of domicile which it is willing to enforce. Phillimore, LIII. Substantially the same variation from international principle is recognized in England in questions concerning domicile of British subjects in different British possessions. Lord Cranworth, in Whicker v. Hume, 7 H. L. 124, adumbrating the ultimate doctrine announced in Moorhouse v. Lord, 10 H. L. 272; cf. Bentwich, Domicile and Succession, 19, 20; and Westlake, 366. It would be singular if it were otherwise within the range of purely domestic questions. If we examine the American cases apparently deviating from accepted doctrines of private international law, we shall find they relate to domestic matters within the separate spheres of the various states of the United States. Such decisions have little precise relation to private international law or to the facts now before me and bearing on the last domicile of a deceased federal soldier of high military rank. All I mean to say is that, in the absence of very express and weighty adjudications of our own courts, the opinions and consensus of the publicists and of the public courts of the world are entitled to be considered in American courts in the solution of such a question as that now before me in this particular matter.

In this matter of Gen. Grant's estate, the profound question for first consideration, if I apprehend it, is not, as argued, whether Gen. Grant, an officer in the regular forces, acquired a new domicile of choice in federal territory, but whether at any time before his death he abandoned his domicile of choice in the country under the jurisdiction of the state of New York. It is not, I think, correct to state that the principle of domicile always requires one domicile of choice to be supplanted by an actual and continuous residence in some other city or place in order to make out a new domicile of choice; or is it accurate to state that all the elements which constitute a new domicile of choice, as contradistinguished from domicile of origin, must be made out with great particularity in every case involving the abandonment by a military man of a mere domicile of choice? Jacobs' text, to the contrary,

is somewhat more guarded than some cases quoting it, but apparently not sufficiently guarded. Section 201, and cases cited, note 4. Dupuy v. Wurtz, 53 N. Y. 556, is commonly regarded as a case upholding the so-called "American doctrine" of the necessity of making out a new and actual domicile somewhere else in every case involving the claims of conflicting domiciles. But if the opinion is examined, the doctrine laid down will be found to be carefully limited to the purposes of succession a testato only. It is not an authority for the so-called American doctrine in extenso. Now that our citizens frequently reside in Asia, Japan, or Central America, we should be extremely guarded in announcing hard and fixed doctrines which may subject them unnecessarily to lexi loci domicilii, not to their advantage.

[7] A domicile of choice may cease, although no new domicile of choice is acquired. This is an accepted principle of private international law.

[8] Westlake gives the correct principle when he says:

"* * * When the domicile which is abandoned was itself acquired by choice, the intention may be limited to that of abandoning it, since if no intention be directed towards any other country, the domicile of origin will be reacquired by reverter on the occurrence of the necessary fact, which it will presently be seen consists merely in leaving the country in which a domicile had been acquired." Priv. Int. Law, 363.

Now this I apprehend to be an eminently correct statement of principle. In Matter of Robitaille, 78 Misc. Rep. at page 117, 138 N. Y. Supp. 391, I took occasion to note Mr. Wheaton's approval of the same principle laid down in the case of the "Indian Chief":

"That the character that is gained by residence ceases by nonresidence. It is an adventitious character and no longer adheres to him from the moment he puts himself in motion, bona fide to quit the country sine animo revertendi."

I know full well that it has been said in some decisions that a person cannot be without a domicile. But I deny that in any case it was necessary to have proceeded so far. Savigny says it is a rare case, but it does happen, that a person may be without a domicile. Savigny, Priv. Int. Law, 63. Now Savigny was a very great jurist. The consensus of such eminent men on a point of this character is not to be rejected by mere implications from general rules applied by our courts to very different questions and very different states of fact. I am very fully aware that it has been said that the so-called "American doctrine of domicile" does not recognize English doctrines on some such points. But I am not thereby persuaded that our courts do not recognize a rule of private international law concerning this particular point. In Miller v. Burrows, 2 Edm. Sel. Cas. 157, Judge Edmunds did recognize it, and Judge Edmunds was one of the very ablest judges this state has honored in the course of its long judicial history. In Miller v. Burrows Judge Edmunds distinctly said:

"The question is not whether the defendant is a resident of Indiana, but whether he is 'not a resident of this state.' * * * The defendant was at one time a resident of Indiana, but that residence he has abandoned, * * * but whether he will take up his residence here, or elsewhere, he is yet unde-

termined. * * * Until his mind shall be settled on that point, until he shall come to a determination, and have a fixed place of habitation, with an intention of staying there, he cannot be said to have a residence anywhere."

It is true that Judge Edmunds, in the opinion just quoted, was dealing only with residence, but not residence as contradistinguished from domicile. He evidently had in his mind the principle of domicile when he made the adjudication quoted. But be this as it may, and if I am entirely wrong in the premises, yet I think it is shown in this case that Gen. Grant's domicile at the time of his death was, for the purposes of this matter, not in this state. In arriving at a conclusion in this case I have felt obliged to take into consideration the nature of our federal government and the separate sovereignty exercised by the federal government of the United States.

As there is in most instances an established domicile to start from, either of origin or choice, it is apparent that the burden of making out a change of domicile of a person sui juris rests ordinarily, as said in some cases, on those asserting it. If we assume that Gen. Grant's domicile of choice, and not his domicile of origin, is fixed at New York up to the year 1899, when he again entered the regular army, and that this domicile of choice is presumed to continue, the burden of showing his change of domicile is, under the cases, primarily on those asserting it in this proceeding. But even if this is true in this matter, I think Gen. Grant's New York domicile of choice is sufficiently shown for the purpose of this matter to have been changed to a domicile in federal territory animo et facto. While it is true, as stated above, that the burden ordinarily rests on the person asserting it, to make out a change in an established domicile of choice, yet we should remember that the incidence of a tax must always be made out by the state or it will be resolved against the taxing power. For this reason I take leave to doubt that there is any dominant presumption applicable to this particular case.

[9] Before proceeding to consider mere definitely the last domicile of Gen. Grant in federal territory, let me for a moment again turn to the law of civilized nations concerning the domicile of military and other officers of high rank and fixed station. The French Code, for example, now provides that, where any office is for life, the presumption of law is that the domicile of the officer is in the place where his functions must be discharged, and the law admits of no proof to the contrary. Phillimore, § CLI. It was a very old rule of Roman law that a soldier would be presumed to have his domicile in the place where he served. D. 50, 23. An ecclesiastic is for the same reason presumed to be domiciled at the place of his cure. Phillimore, § CLXXXIV. The substance of the sensible rule of the French Code is observed generally in Europe whenever official obligations are inconsistent with a domicile elsewhere than at the place where the duties of the permanent office must be discharged. The rule in question, I may observe, is very ably discussed by Sir H. Jenner Fust in Craigie v. Lewin, 3 Curt. Ecc. 435, although some expressions of that opinion are now much modified by later authority. I do not, however, cite these foreign examples as having a direct bearing here on any other point

than the mere probability that Gen. Grant's de facto domicile was in federal territory after he abandoned his home in the city of New York, a question of fact which I shall presently consider more carefully.

[10] In the judicial determination of the last domicile of a general officer in the regular military service of our federal government many things are entitled to consideration which would not be pertinent to a determination of the domicile of a civilian. The private courts of all the great nations do, I think, recognize a distinction in their application of the principle of domicile to the military status. I am quite aware that it is now a general rule that a soldier does not acquire a domicile in the place where he is stationed, but this is not to say that an American officer may not acquire a domicile in federal territory of the United States if his actual residence in such federal territory is coupled with animus manendi there after his duty expires. The ordinary modern rule—that a soldier does not change his domicile by foreign service—is in any event a mere presumption which may be rebutted in any case; it is not properly a rule of law. Ames v. Duryea, 6 Lans. 155, affirmed 61 N. Y. 609. The opposite doctrine indeed was once the rule of the British courts, and a British soldier stationed in India then acquired a domicile in the country where he was stationed. Phillimore, CLIV. There is, I think, no fixed rule of law which prevented Gen. Grant, when he is proved to have abandoned New York as his domicile de facto and fixed his residence at Governor's Island, from constituting his future domicile of choice anywhere in federal territory. His actual residence in federal territory was sufficient to enable him by mere intention to fix a domicile anywhere else in federal territory.

When a federal officer breaks up his home and departs from a mere residence of choice to a permanent military station of the United States in federal territory, where he continually resides, certainly his residence de facto is then in federal territory whatever his domicile of origin, his domicile de jure, or prior domicile of choice may be. When Gen. Grant gave up his home in New York City and took up his permanent and only residence with his entire family at his headquarters in Governor's Island, he was thereafter actually living in federal territory, and it appears that he had then forever abandoned his private residence in New York City. Can we say that such abandonment and actual residence are of no weight in his case when we have the element of abandonment and of actual residence animo manendi in federal territory fully established? On the contrary, I take it that Gen. Grant's actual abandonment of New York and his subsequent permanent residence in federal territory are in this particular case very significant facts.

The surrogate had occasion to observe before in this opinion that the principle of domicile always relates to territory, or to states at large, and never to cities or particular towns. The principle of domicile cannot now relate to a city or town, because it is always the invocation of the larger law of a state or territory. This point is so elementary and so well established as to need no citation of authority. The arguments of counsel for either party are broad of the point when this case is

treated as one involving a domicile either in the city of Washington or the city of New York. There is now no such thing in law as a domicile in a particular city. One is domiciled in a country or territory, although he may reside in a particular city. The contrary notion is to confuse domicile with residence. In Roman law, when the city state was the imperium, domicile in a city could exist. But not now. If it be made out here that Gen. Grant while actually residing permanently in federal territory, to wit, in this case, while at Governor's Island, animo manendi, or while on duty expressed his intention, as he did in fact, of always continuing to live in federal territory, to wit, the city of Washington, we have, I think, the union of animus (intent) and factum (actual residence) necessary to constitute his last domicile of choice in federal territory by the most stringent rule of the American cases. Such union of animus and factum brings Gen. Grant within the doctrine of those early New York cases which are presumed by comptroller's counsel to establish a doctrine of private international law, that in every case where a new domicile of choice is alleged as against a former domicile of choice actual residence in the new domicile of choice must be established. The surrogate has examined the New York adjudications cited on this point, and he again takes leave to doubt that they were ever intended to lay down so universal a proposition; but, if they were so intended, Gen. Grant's case falls within the rigidity and inflexibility of the principle. The city of Washington is but one geographical point in federal territory, while Governor's Island is another. This is enough to make out his actual residence in federal territory. His animus manendi there is proved as a fact.

[11] That the state of New York has concurrent jurisdiction with the federal authority in some few instances at Governor's Island does not make that great military station any the less federal territory, and federal territory only for the purpose of this matter. That a citizen of the United States may now have a federal domicile, as contradistinguished from a domicile in a particular state of the Union, no longer needs argument. It is settled law.

[12] I am quite aware that this is a case of difficulty, very great difficulty, but I am persuaded that in justice the state of New York has not made out its contention that the estate of Gen. Grant is subject to the tax claimed from it.

Enter decree accordingly.