(Surrogate's Court, New York County. February 14, 1916.)

1. DOMICILE ⊚⇒9—EVIDENCE—DECLARATIONS—TRANSFER TAX.

The intention of the deceased as to residence may be proved by any relevant evidence, including declarations of the deceased, which are always competent to prove animus, but all of which are not of the same weight.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 38; Dec. Dig. ⊚⇒9.]

2. DOMICILE ⊚⇒8—EVIDENCE—BURDEN OF PROOF—TRANSFER TAX.

Where the domicile of origin of the deceased was in New York, the burden of proof was on the executors, seeking to establish the domicile of choice in London, since a domicile either of choice or of origin, once established, is presumed to continue.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 36, 37; Dec. Dig. ⊚⇒8.]

3. DOMICILE ⊚⇒2—TRANSFER TAX—SITUS OF PERSONAL PROPERTY—"DOMICILE"—"RESIDENCE."

"Domicile" refers to the relation created by law between an individual and a country, while "residence" refers to living in a particular locality, and requires only bodily presence as an inhabitant, whereas, in addition to that, domicile requires an intention to make it a permanent residence.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 2; Dec. Dig. ⊚⇒2.

For other definitions, see Words and Phrases, First and Second Series, Domicile; Residence.]

4. TAXATION ⊚⇒93—TRANSFER TAX—SITUS OF PERSONAL PROPERTY—RESIDENCE OF DECEASED.

Personal property is taxable in the state of residence of the owner, so that adjudications giving an independent situs, irrespective of the domicile of the owner for taxing purposes only, being an exception to the general rule of law, must be of very limited application.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 182–188; Dec. Dig. ⊚⇒93.]

5. TAXATION ⊚⇒867—TRANSFER TAX—SITUS OF PERSONAL PROPERTY—DOMICILE OF OWNER—BURDEN OF PROOF.

Where an executor seeks to escape payment of transfer tax in the domicile of origin, by showing a new residence of choice in a foreign country, the new residence must be clearly established.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1681–1684; Dec. Dig. ⊚⇒867.]

6. TAXATION ⊚⇒867—TRANSFER TAX—SITUS OF PERSONAL PROPERTY—DOMICILE OF WARD—BURDEN OF PROOF.

Where the deceased was originally domiciled in New York, and later for a time resided in Paris, but maintained a place of residence in New York, and thereafter went to London, and resided there up to the time of his death, the burden was still on his executors, seeking to avoid payment of the transfer tax, to show the establishment of the domicile of choice in London.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1681–1684; Dec. Dig. ⊚⇒867.]

7. DOMICILE ⊚⇒10—EVIDENCE—DECLARATIONS—PUBLISHED WRITINGS—WEIGHT.

Where the deceased in published writings made statements as to his intention in regard to residence, and the writings were frivolous, vola-

tile, and of no weight, the declarations were of little value as evidence, since, to make them of value, they should be spontaneous utterances connected with some competent res gestæ.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. ⊛⟶10.]

8. DOMICILE ⊛⟶10—EVIDENCE—SUFFICIENCY.
   Statements in "Who's Who" as to the intention of one referred to therein in regard to domicile, although brought home to him, do not estop him from establishing a subsequent domicile of choice contrary to the statements.

   [Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. ⊛⟶10.]

9. DOMICILE ⊛⟶10—EVIDENCE—SUFFICIENCY.
   Although the will of deceased, made two years prior to his death, described him as of the city and state of New York, his executor was not thereby estopped to show a later domicile of choice in London.

   [Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. ⊛⟶10.]

10. DOMICILE ⊛⟶10—TRANSFER TAX—SITUS OF PERSONAL PROPERTY—EVIDENCE—SUFFICIENCY.
    Evidence held to show that the deceased had established a domicile of choice in London, thus destroying his domicile of origin in New York.

    [Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. ⊛⟶10.]

11. NAMES ⊛⟶14—IDENTITY—SIMILARITY OF NAMES—PRESUMPTION.
    A presumption of identity arises from the similarity of names.

    [Ed. Note.—For other cases, see Names, Cent. Dig. § 10; Dec. Dig. ⊛⟶14.]

12. WITNESSES ⊛⟶255—BEST EVIDENCE—ADMISSIBILITY OF COPIES.
    For the purpose of refreshing the memory of a witness, the carbon copy or transcript of notes dictated to him is admissible, and may be used in lieu of the original stenographer's minutes, if made within a reasonable time after the transaction.

    [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 874–890; Dec. Dig. ⊛⟶255.]

13. APPEAL AND ERROR ⊛⟶1048—BEST EVIDENCE—ADMISSIBILITY OF COPIES.
    Error in admitting a copy of a stenographer's transcript of his notes for the purpose of refreshing his memory is harmless, where he stated that he could give the substance without reference to the paper admitted.

    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4140–4145, 4151, 4158–4160; Dec. Dig. ⊛⟶1048.]

14. TAXATION ⊛⟶895—INHERITANCE TAXES—NATURE OF PROCEEDING—APPRAISERS—EVIDENCE.
    Proceedings before appraisers are in the nature of inquisitions, and common-law rules of evidence regulating trial by jury cannot be insisted on in such proceedings to the prejudice of the state, but substantial justice is all that is required.

    [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⊛⟶895.]

Proceeding by the state comptroller to assess a transfer tax on the estate of Frederick Townsend Martin, deceased, opposed by the Metropolitan Trust Company, executor. Heard in the Surrogate's Court on reference from the substitute appraiser. Decree in favor of executor.

John B. Pine, of New York City, for executor.
John B. Gleason, of New York City, for State Comptroller.

FOWLER, S. This is a proceeding under the Transfer Tax Law (Consol. Laws, c. 60, §§ 220–245). The decedent died in London, England, March 8, 1914. In this proceeding to fix the transfer tax, commenced upon the petition of the state comptroller, the Metropolitan Trust Company, executor under the testator's will, contends that the intangible property belonging to the estate is tax exempt, for the reason that the decedent died domiciled abroad. The tangible property belonging to the decedent in this jurisdiction is less than $600, and consists of wearing apparel and personal effects, paintings, some books and housefurnishings.

The proceeding was originally referred to Mr. John F. Martin, appraiser, and affidavits were filed with him. Thereafter, upon his retirement from office, the proceeding was continued before Mr. William J. Campbell, appraiser, and it was stipulated that the proceedings already taken should be deemed to be taken before the new appraiser. In June, 1915, Appraiser Campbell referred the matter to the surrogate for determination of the issue of decedent's last domicile or residence. Thereafter, and on October 22, 1915, the executor, who, in the petition for probate, had alleged that the decedent was resident in Paris, France, and who up to that time in this proceeding had made the contention of a domicile or residence in France, procured an order for the taking of depositions of four witnesses, residents of London, in order to prove that the decedent at the time of his demise was domiciled or resided in London. These depositions have been returned. The matter now comes on before the surrogate for hearing upon these depositions and the testimony taken before the appraiser. Before entering on a consideration of the facts I will briefly refer to the law governing this matter.

The Transfer Tax Law (section 220) classifies taxable transfers primarily according to residency: (1) Where the transfer is * * * from any person dying seised or possessed thereof while a resident of the state; (2) * * * from a nonresident. The government in this matter claims that Mr. Martin, deceased, was at the moment of death a resident of this state. The controversy before me concerns Mr. Martin's last residence, not his last domicile, except in so far as domicile and residence are convertible terms of law.

The matter is a somewhat complicated one by reason of the extreme mobility of modern times. As Sir William Vernon Harcourt once said (Foreign Relations U. S. 12431):

"Of all questions of law those which concern domicile are the most complicated and obscure, because they ultimately depend on the intention which is necessarily of all things the most difficult to determine."

[1] But perhaps we ought to note that at the time this was so said the books of the law were less clear than they are now on rules regulating proof of intention when regarded as an issuable fact. At the present day intention may be proved, just as any other fact is proved, by any relevant evidence. Intention is no longer regarded as hermetically sealed up in a man's inner consciousness and as incapable of proof. In other words, intent is no longer a "hidden mystery." A state of mind is now provable in the same manner as a state of health.

Phipson on Ev. 52, 133, and cases there cited. Declarations of the person whose domicile is disputed are one mode of proving intention. Such declarations are always competent to prove animus, or a state of mind or intent. Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950. Any other proof of intention, if legally relevant, is equally competent. But not all declarations of one deceased are of the same weight. Declarations are relevant when made under some circumstances, and irrelevant or of trifling value when made under others. I agree with the statement of Mr. Dicey (Conf. L. 139) that:

"Any circumstance may be evidence of domicile which is evidence of residence (factum) or of his intention to reside permanently (animus) within a particular country."

The limitations on the rules of evidence on domicile I shall discuss further when I come to consider the nature of the evidence submitted to me in this matter.

[2] Before entering on the consideration of the facts in this particular case, let me refer, also, to the rules regulating the weight of evidence in such matters as this. Where a domicile of origin, or a later domicile of choice, is once firmly established by the evidence, in the absence of further proof, such domicile so established is presumed to continue, and the onus of proving the contrary is then on those asserting a change of such domicile or residence. Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950. In this matter the domicile of origin of the deceased, as well as his original residence, were established to be in this state. It is now alleged by the executors of Mr. Martin that this domicile of origin, or original residence, if you please, was subsequently twice changed by Mr. Martin to a new domicile of his choice. The onus of making out this allegation undoubtedly rests, as before stated, on his executors in this case.

[3] It will be observed that the Transfer Tax Act now under consideration does not speak of the domicile of taxable persons, but of their residence. In some of the books of the law "domicile" and "residence" are treated as convertible legal terms; but, as pointed out in Matter of Newcomb, 192 N. Y. at page 250, 84 N. E. 950, domicile is a more exclusive term of art than residence. I observe that Matter of Newcomb was a succession case, and in some respects there is a distinction between a domicile when regarded for the purposes of succession and a domicile for the purpose of taxation. In the latter class of cases I apprehend that a change of domicile or nonresidence may be more easily established than in a case where the rules of succession in a new or old domicile are invoked. I am confirmed in this distinction by several adjudications. Somerville v. Lord Somerville, 5 Ves. 750; Dupuy v. Wurtz, 53 N. Y. 556. It is said, for example, in later cases that:

"Domicile has many meanings, according as it is used with reference to succession or for determining rights of belligerents or for ascertaining trading privileges." Per J. O., Yelverton v. Yelverton, 29 L. J. P. & M. 40, 1 Sw. & Tr. 574, cited 1 Stroud, 566.

The difference between a domicile for the purposes of a succession ab intestato and a domicile for taxation is, I think, observed in United

States Trust Co. v. Hart, 150 App. Div. 413, 135 N. Y. Supp. 81, affirmed on this point 208 N. Y. 617, 102 N. E. 1115.

In some instances domicile and residence are convertible terms. In Lower Canada, where article 63, Civil Code, requires a marriage to be solemnized at the domicile of one of the parties, the term "domicile" is held to mean residence, and not to refer to an international domicile. McMullen v. Wadsworth, 59 L. J. P. C. 7, 14 App. Cas. 631. But, on the other hand, Lord Westbury, in Bell v. Kennedy, L. R. 1 Sc. App. 320, said:

> "Residence and domicile are two perfectly distinct things. Domicile is an idea of law; it is the relation which the law creates between an individual and a particular locality or country."

Dicey (Conf. Laws, p. 83, notes) makes some discriminating comments on the confusion of the term "residence" as contradistinguished from domicile. In Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950, the Court of Appeals said:

> "Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile."

In Matter of Grant I referred to the principle that domicile always refers to territoriality, not to a particular place in a political territory. 83 Misc. Rep. at page 262, 144 N. Y. Supp. at page 571. In this regard Savigny properly says:

> "The principle of domicile is to be regarded as determining, in the ordinary case, the peculiar territorial law to which, as his personal law, every individual is subject."

So Dicey's Conflic. Laws, 69, says: Lex domicilii means the law of the country where a person is domiciled. The Scotch judge, Lord Jeffry, made the proper distinction in Arnott v. Groom Ct. Sessions Cas. (1846) 9 D. 150:

> "I cannot admit that in order to make a domicile it is necessary to have some particular spot within the territory of a law. * * * If the purpose of remaining in the territory be clearly proved, aliter, a particular home is not necessary."

In my judgment domicile is in law that principle which permits a person to invoke the law of a particular country rather than that of another to which he was formerly subject, either by reason of nativity or by subsequent choice. I shall not waste more time in demonstrating that, in the idea of all publicists, domicile relates to territory, and not to locality within the territory of a particular state. An invocation of domicile is always an invocation of the law of a country, not of the law of a city or town. A man is domiciled in a state, e. g., France, England, or New York. He resides in London, Paris, or Albany. This matter on the statute now before me involves more strictly an application of the legal meaning of the term "resident" than an application of the legal meaning of the term "domicile."

Whether or not the term "residence" is or is not held to be equiv-

alent to domicile at the present stage of legal development in this state, the adjudications on domicile are certainly highly instructive of the principles which ought to govern a legal residence. Therefore I have not hesitated in different adjudications to apply such principles in a proper case. Matter of Grant, 83 Misc. Rep. 257, 144 N. Y. Supp. 567; Matter of Wise, 84 Misc. Rep. 665, 146 N. Y. Supp. 789; Matter of Riley, 86 Misc. Rep. 628, 148 N. Y. Supp. 623; Matter of Rothschild, 86 Misc. Rep. 364, 148 N. Y. Supp. 368; Matter of Mesa y Hernandez, 87 Misc. Rep. 242, 149 N. Y. Supp. 536; Matter of Rutherford, 88 Misc. Rep. 414, 150 N. Y. Supp. 734. In the interpretation of statutes in England I observe that the courts of that country frequently regard "residence" and "domicile" as convertible terms. A joint-stock company is, for example, "domiciled" only where it "resides." Jonas v. Scottish Acc. Ins., 55 L. J. Q. B. 415, 17 Q. B. D. 42.

If there is any distinction to be drawn between the terms "domicile" and "legal residence," I take it that the looser term is "residence," and that a change of residence is much more easily made out than a change of domicile. In the application of these abstractions to this concrete case I shall assume that Mr. Martin's change of residence could be more easily made out than his change of domicile.

[4] There is another principle to be considered. The main rule governing taxation as applied to a state of our American Union is that its taxes must fall on subject-matter within its territorial jurisdiction. Of course, personal property of residents of the state is only taxable because of its fictitious relation to legal residency. Personal property of nonresidents is theoretically not within the jurisdiction of a state for the purposes of taxation. The adjudications to the contrary giving an independent situs irrespective of the domicile of the owner for taxing purposes only are an exception to a general rule of law, and consequently, as they ought to be, of very limited application.

[5] In cases of this kind, where an obvious effort is made to escape taxation in the domicile of origin by a constructive reference to a new residence of choice alleged to be acquired in a foreign country, the element of factum, or new residence, should be clearly established by the proofs. Such an instance is a proper one for the application of the Anglo-American rule that "no person can be without a domicile." Dicey, Conf. Law, 97. While this rule last mentioned is not generally admitted to be an accurate statement of public law by the publicists of Europe, such as Savigny, as I attempted to show in Matter of Grant, 83 Misc. Rep. at page 264, 144 N. Y. Supp. 567, yet this local rule, if rule it is, is, I think, a very good one for application in cases of this character relative to the proper incidence of taxation.

[6] Having now cleared away, to some extent, the generalities of legal discussion, we may approach with more accuracy the finite question now submitted to me in this matter for adjudication: Was or was not the deceased Mr. Martin a resident of this state, for the purpose of taxation, at the time of his demise? This is the only question now here, and it is largely a question of fact. Let us examine this unnecessarily voluminous record and ascertain, if possible, what are the relevant facts.

The decedent, Mr. Martin, was born in Albany, N. Y., in 1849, and was educated in Albany. He never married. It appears that Mr. Martin at one period became a member of the Tenth Regiment, National Guard of the state of New York, and was promoted to the rank of colonel in that organization. About 1885 Mr. Martin removed to New York City, and there he lived in a house on Twenty-First street, which was furnished with some articles taken from his parents' home and brought to New York from Albany by Mr. Martin. Later it seems that Mr. Martin resided with his sister in the city of New York, and for a time at the Murray Hill Hotel, in the same city. Upon the opening of the Plaza Hotel, New York City, in October, 1907, Mr. Martin engaged rooms. From that time on Mr. Martin occupied a suite of two rooms and bath in the Plaza Hotel, and upon his return to town from abroad in the autumn of each year always occupied the same rooms. He had no definite lease of this particular suite, but his arrangement with the hotel manager was that he should always have the same rooms, and that while he was absent some of his belongings, namely, articles, of "bric-a-brac" and four or five small paintings, should be removed from these rooms to the hotel storeroom. Mr. Martin did not pay for the suite of rooms during his absence. When he registered at the Plaza Hotel he gave New York as his residence.

Mr. Martin's places of residence, sojourn, and itinerary prior to 1904 are not so clearly set forth in the record as they are for the period subsequent to 1904. Mr. Martin's movements during the later period are given in much greater detail by his manservant, one Frederick C. Smith, who entered Mr. Martin's employment in the autumn of 1904. Later we find Mr. Martin at the Berkeley Hotel, in London, after coming from Paris, and after staying in London for a week he came to New York, where he remained for about four months, then going to Palm Beach. About the month of July, 1905, Mr. Martin went to England, and stayed there six weeks, and then went to Scotland, where he remained about two months. Then, after a stay in London, Mr. Martin returned to New York in October, 1905. In June, 1906, Mr. Martin went abroad, and traveled about in England and Scotland until October, 1906, when he again returned to New York. After remaining in New York, stopping at the Murray Hill Hotel until the end of April, Mr. Martin visited Italy, and after a month's sojourn in that country he went to Paris. During his stay in Paris, of about two months, he occupied rooms at the Palace Hotel, Champs Elysées. From Paris Mr. Martin went to England and Scotland, and returned to New York in October, 1907, and occupied the customary rooms in the Plaza Hotel. Except for about six weeks at Palm Beach, Mr. Martin remained in New York until May, 1908, when he again went abroad. This time, when in Paris, he occupied an apartment at 48 Avenue Gabrielle. After two months in Paris and a similar period in England and Scotland, Mr. Martin again returned to New York in October or November, 1908. Mr. Martin remained in New York until about May, 1909, except for a short run to Palm Beach. Mr. Martin from New York went to Paris, where he remained for a time in the apartment at 48 Avenue Gabrielle, and then went to Scotland and England, re-

turning to New York again, as in the prior years, in about the month of October. In April, 1910, he sailed for Spain, where he remained about a month, then going to the apartment in Paris. After remaining in Paris about a month, he went to England and Scotland, and then returned to New York in October. Except for the usual visit to Palm Beach Mr. Martin remained in New York until May, 1911, when he went for a two months' stay to the apartment at Paris, and from there he proceeded to England and Scotland, and then back again to New York. This winter season included not only a trip to Palm Beach, but also a few days' visit to Lincoln, Neb. In May, 1912, he went to the apartment in Paris for a two months' stay, then to England and Scotland, again returning to New York in the autumn of 1912. Upon the death of Mr. Bradley Martin, decedent's brother, in February, 1913, Mr. Frederick Townsend Martin proceeded to England. After staying there for about a month he went to Paris, to the apartment at 48 Avenue Gabrielle, where he spent about a month, returning to New York in April, 1913, stopping en route for a short time in England. Again after a three weeks' stay Mr. Martin went to England. In July, 1913, he went to Baden Baden, Germany, for about five or six weeks returning to England via Paris, where he stopped one night. Mr. Martin remained in England and Scotland during the winter of 1913–1914, at the Berkeley Hotel, London. On March 8, 1914, he died at the Berkeley Hotel, Piccadilly, London, W., still unmarried.

Thus it appears that from 1904, on and up to the time of his brother's death in February, 1913, Mr. Frederick Townsend Martin always returned to the Plaza Hotel, New York City. He habitually wintered in New York, making a short trip during the season to Palm Beach, so as to be there during the gaiety. He usually went abroad in the early summer to England and the Continent, and returned to New York to the Plaza Hotel in the autumn of each year.

While Mr. Martin was in England he ordinarily stopped at the Berkeley Hotel in Piccadilly. In December, 1913, upon the death of his intimate friend, Mr. Henry M. Sands, Mr. Martin was bequeathed all Mr. Sands' jewelry and his furniture, books, paintings, and household effects, which were in the apartment at No. 48 Avenue Gabrielle, and he was also bequeathed the sum of $25,000. Mr. Martin voluntarily regarded the pecuniary bequest as one intended to provide a place where the articles left by Mr. Sands could be kept, but this was a sentimental reason only. It appears that in December, 1913, Mr. Martin made the first payment of £3,000 on the purchase of a dwelling house, known as No. 6 Great Cumberland place, London, agreeing to pay the balance on March 25, 1914.

A considerable portion of the last few months of decedent's life was devoted to acquiring furniture, paintings, and other articles suitable for fitting up the house at No. 6 Great Cumberland place, London, as a residence. In the course of the purchasing of such articles, Mr. Martin made various declarations as to the intended use to which this house was to be put. It is upon the conduct of the decedent in these last few months that the executor predicates a London domicile, or last residence.

In examining the contention of the estate in this proceeding and in determining whether or not the residence of Mr. Martin was within this jurisdiction at the time of his death, certain well-established principles must be applied. It is well settled that "domicile" includes something more than residence. As the decedent was born in this state, educated in this state, and until 1890 did not maintain any semblance of a residence without the state, his domicile up to 1890 was undoubtedly within this state. As the executor urges that a domicile outside of this jurisdiction, that domicile must be deemed to be one of choice. It superseded the domicile of origin. The burden, as stated before, is upon the executor to establish such change. Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950. The burden is not upon the state comptroller to establish a New York residence, as seems to be the contention of the learned counsel for the estate. That contention is based upon the assumption that a residence in Paris was established. The learned counsel for the state comptroller does not contend that the New York domicile originated only when the Paris residence ceased in 1913, but correctly urges that his domicile of origin was within this jurisdiction and that it continued the legal domicile. The testator's domicile is deemed to continue here, in the absence of affirmative proof establishing a domicile elsewhere.

The only facts and circumstances which are relied upon to point to a domicile in Paris are Mr. Martin's temporary occupancy of the apartment, 48 Avenue Gabrielle, and various declarations of Mr. Martin. This apartment seems to have been leased or rented in the name of Mr. Sands, and not in the name of Mr. Martin. Doubtless they both occupied the apartment and both contributed to its upkeep and furnishing. Mr. Martin, however, lived in the apartment only about two months of each year, always returning to New York after an annual visit to Paris. I do not, however, consider it necessary to determine whether or not Mr. Martin's legal residence ever was or was not in Paris. The only point here is whether his subsequent and last legal residence was England or the state of New York. The moment we postulate that any one is now free by the public law to change his domicile or residence of origin, the question is not whether he once did so at some remote period, but whether at his death he had a domicile or residence of choice anywhere differing from his domicile of origin or the domicile of some prior choice, when that is once established as a fact. In this matter before me the question then is, Where in law and in fact was Mr. Martin's last domicile, or rather his last legal residence?

[7] A good deal of evidence has been directed to Mr. Martin's declaration contained in his published writings. It seems to me that this is a very light character of evidence. Whatever Mr. Martin may have been, it is evident that he was not technically or professionally "a man of letters." He ought not, I think, to be held to account for volatile utterances contained in his slight literary performances. Declarations, to be evidence, must be made under more solemn circumstances than is evident in books such as Mr. Martin's. Declarations, to be evidence, ought to be spontaneous utterances connected with some

competent res gestæ. They should not be declamations or apostrophes contained in books published by an amiable and untrained literary amateur.

[8] As to the evidential value of statements in the publication denominated "Who's Who," all I will say is that they have not been clearly brought home to the late Mr. Martin. But if they have been so brought home, they do not estop him from a subsequent domicile of choice in England. Such statements were made anterior to the alleged London residence which, by the executors, is now asserted to have been the last residence of Mr. Martin.

In my judgment too much attention has been paid to the nature of Mr. Martin's Paris residence, as that fact is really immaterial, at this time, to a correct solution. During the time that the Paris apartment was maintained, as Mr. Martin had his rooms at the Plaza Hotel and his conduct in no way evidences a conclusive intention to make Paris his home, the evidence points emphatically to a continuation of the New York domicile of origin. When a notice was received, for example, from the commissioner of taxes in this city, Mr. Martin appeared on the 8th day of November, 1912, and procured an exemption on the ground that he had no taxable assets. The notice referred to Mr. Martin as of 505 Fifth avenue, and his deposition before the commissioner gives his residence at the Plaza Hotel. In the same year Mr. Martin was served with a notice to attend before the commissioner of jurors, for the purpose of qualifying as a juror. Mr. Martin attended accordingly and claimed exemption on the ground that he had been a member of the National Guard. He did not urge nonresidence, though the notice addressed to him stated his residence at the Plaza, and his business address at 505 Fifth avenue, in the city of New York.

[9] The will of the testator describes him as of the city and state of New York, and much importance is attached to this recital. The will was executed April 29, 1913, or during the time Mr. Martin had returned to New York for a short sojourn; he having gone abroad in February. Although in New York for a brief visit, Mr. Martin executed his will and recited that he was of the city and state of New York. This is certainly significant of a domicile in the year 1913. But such a recital is not operative as an estoppel. It did not prevent Mr. Martin from subsequently changing his domicile or residence either from France to England or from New York to England. I think I stated this principle accurately in Matter of Riley, 86 Misc. Rep. 628, 148 N. Y. Supp. 623. Had Mr. Martin died the day after he made his will, the recital might have been conclusive as to his last domicile or last residence; but he died some while after the execution of the will, and at a time when he had lately acquired a dwelling house in London. Be the fact as to the Paris domicile one way or the other, it does not materially affect my conclusion as to his last residence in London.

[10] The real inquiry concerns the assertion that Mr. Martin acquired a domicile in London during the last few months of his life. As has been before pointed out, the executor first urged that Paris

was Mr. Martin's last residence. It was only after these proceedings had been begun that London was asserted to be his last legal residence. It is immaterial, for the purposes of this proceeding, that Mr. Martin sometimes resided in a particular country other than New York. The legal question is whether his domicile of origin in this state was ever relinquished in favor of a domicile or residence in England. In a determination of the latter question it is important, as a subordinate consideration, to notice that the executor bases the claim of exemption from taxation upon the acquisition of a domicile or residence in London, succeeding an earlier domicile in Paris. The executor did not at first urge that the domicile in London, the one now relied upon in this proceeding, directly succeeded the relinquishment of the domicile of origin; that is, the executor now asserts that the London domicile or residence was the second domicile or residence of choice. If such a contention is correct, the burden of establishing a New York residence might be upon the state comptroller, and the burden of establishing the foreign residence might not be upon the executor. But, wherever the onus may be, the assertion of a London domicile after a Paris domicile acknowledges that the former started only in 1914, when the latter ended, and that the residence of Mr. Martin in London prior to 1914 was insufficient to predicate a domicile. In brief, the argument of the executor concedes that animus was lacking in Mr. Martin's London residency prior to 1914 and that it arose only after 1914.

In or after 1914, it appears that Mr. Martin purchased a residence in London and devoted a considerable portion of his time to furnishing it. He went about among the London shops acquiring furniture and ornaments for this new house, and he purchased some of the contents of the house from one Mrs. Goudy, the former owner of the premises. While making these purchases it seems that various declarations were made by Mr. Martin in the different shops which he visited. Such declarations are contained in the depositions of three of the witnesses. The substance of these declarations is that Mr. Martin intended to make his permanent residence at No. 6 Great Cumberland place, London. Up to this time this bachelor had for years really been without any regular home. He was a mere "bird of passage," stopping mainly at hotels. He had no regular residence; he was here to-day and off to-morrow. But when he acquired a dwelling house in London he did an act which in law is highly significant of intention, and when he definitely declared his intention of thereafter residing in London, such declarations seem conclusive on an issue of this character. I take it, in any event, that these declarations in London, as the last made by Mr. Martin himself, are entitled to very great weight. I think the deed of trust executed by Mr. Martin February 18, 1914, appointing a trustee of Lord Craven's estate, in which Mr. Martin describes himself as of No. 6 Great Cumberland place, is also of great weight, as is the assignment of the leasehold to Mr. Martin, dated March 5, 1914, in which he gives his address as Berkeley Hotel, London.

[11] Before concluding I will for a moment consider the alleged errors in the reception of evidence by the appraiser. The executor

urges various errors. Petitioner's Exhibit D, which is the letter head of the American Embassy Association, contains merely cumulative testimony and should be disregarded. The identity of the person referred to in Exhibit C was sufficiently established to allow its introduction in evidence; not only was there a presumption of identity from similarity of names (Douler v. Prudential Ins. Co., 143 App. Div. 537, 128 N. Y. Supp. 396), but there also was a positive identification. The appraiser excluded the record of the commissioner of jurors, and all that was before him was the jury notice, which was shown to have been received by Mr. Martin.

[12] The letter which was offered in evidence as Exhibits E, F, and G, bearing date March 4, 1914, was properly received. The carbon copy of the letter was not introduced as secondary evidence or in any way in lieu of the original. The state comptroller did not offer the paper in evidence as a written declaration of the testator, but as Mr. Parsons' memorandum of the verbal declarations made to him on March 4, 1914, when the letter was dictated. The question is not whether the original letter was admissible, but whether the oral declarations of Mr. Martin made to his secretary should be received. The objection originally interposed upon broader grounds by the learned counsel for the executor was later confined to an objection that the carbon copy or transcript of the stenographer's minutes could not be received in lieu of the original stenographer's record. Under the decisions a written memorandum made at or about the time of the testator's death could be used by Mr. Parsons to refresh his recollection, or, if upon reference thereto by him his recollection was not refreshed, the memorandum itself under certain circumstances could be offered in evidence. McCarthy v. Meaney, 183 N. Y. 190, 76 N. E. 36. An important consideration, therefore, is whether the carbon copy or transcript could be used in lieu of the original stenographer's minutes. The original memorandum made at the time is not always requisite. Clark v. Nat. Shoe & Leather Co., 164 N. Y. 498, 58 N. E. 659; Hodnett v. Gault, 64 App. Div. 163, 71 N. Y. Supp. 831; Wigmore on Evidence, §§ 736 and 749. It seems within the authority of the cases cited that, had the original notes been taken in longhand and then been copied, the copy could be used as a memorandum in lieu of the original memorandum, provided the witness made the same at or about the time of the declarations, and provided, also, that the witness identified the accuracy of the copy. There should be no difference in principle whether the original memorandum was made in shorthand, or is a longhand transcript thereof. The precise point seems never to have been adjudicated in this jurisdiction, and there is a conflict of authority among the courts of other states. Wigmore, supra. In Bass v. State, 136 Ind. 167, 36 N. E. 124, the witness was allowed to testify from a typewritten copy transcribed from shorthand notes. This case has been approved in Higgins v. State, 157 Ind. 57, 60 N. E. 685; but a later decision in Indiana (Southern Ry. Co. v. State, 165 Ind. 613, 75 N. E. 272) seems to cast some doubt upon it. In State v. Dougherty, 86 N. J. Law, 525, at page 546, 93 Atl. 98, a witness testifying to inconsistent declarations was permitted to testify from

a typewritten transcription of his original stenographic minutes. In that case the witness was allowed to use the memorandum for the purpose of refreshing his recollection. While any memorandum in this state may be used for the purpose of refreshing the recollection of a witness, though it might not be sufficient where it serves as independent testimony auxiliary to the testimony of a witness who has forgotten its contents, sanction of its use as a memorandum to refresh recollection recognizes the use of a transcript in lieu of the original stenographic notes, and takes notice that a transcript made by an expert is equivalent to the original stenographic notes.

[13] In the case at bar, moreover, the memorandum can be disregarded. The witness Parsons stated that he could give the substance of the dictation without reference to the letter, though he did not remember the exact words. But any error in the reception of the memorandum is harmless in this case.

[14] Proceedings before appraisers are in the nature of inquisitions, and the common-law rules of evidence regulating trial by jury ought not to be strenuously insisted on to the prejudice of the state. Substantial justice is all that can be required.

My final conclusion is that the evidence makes out that for taxing purposes Mr. Martin's last residence was in London, England, and nowhere else. I have given perhaps more consideration to this matthan its real importance required, but it concerns an issue now frequently arising in this jurisdiction.